POLETOWN NEIGHBORHOOD COUNCIL v CITY OF DETROIT

Docket No. 66294. Argued March 3, 1981 (Calendar No. 7).—Decided
    March 13, 1981. Dissenting opinion of Justice Ryan filed April
    20, 1981.

    The Poletown Neighborhood Council, an unincorporated associa-
    tion, and ten residents of the Poletown area of Detroit brought
    an action against the City of Detroit and its Economic Develop-
    ment Corporation for declaratory and injunctive relief to pre-
    vent the condemnation of land in Poletown to be conveyed by
    the economic development corporation to General Motors Cor-
    poration for the construction of new Fisher Body and Cadillac
    assembly plants. The plaintiffs raised several grounds for relief,
    among them that the condemnation of land in this case is a
    taking of private property for a private use in violation of the
    state Constitution, and that the cultural and social institutions
    of Poletown would be destroyed in violation of the Michigan
    Environmental Protection Act. The Wayne Circuit Court,
    George T. Martin, J., held against the plaintiffs on these and
    other issues, and denied relief. The plaintiffs appealed to the
    Supreme Court by leave granted prior to decision by the Court
    of Appeals. In a per curiam opinion signed by Chief Justice
    Coleman and Justices Kavanagh, Williams, Levin, and Moody,
    the Supreme Court held:
    The taking in this case is for a public purpose and does not

REFERENCES FOR POINTS IN HEADNOTES

[1-4, 6, 7, 9, 11-20] 26 Am Jur 2d, Eminent Domain §§ 25-40.

[5] 26 Am Jur 2d, Eminent Domain §§ 2, 10-13.

[7] 26 Am Jur 2d, Eminent Domain § 32.

[8] 26 Am Jur 2d, Eminent Domain §§ 33, 34, 66.
    Propriety of court's consideration of ecological effects of proposed
        project in determining right of condemnation. 47 ALR3d 1267.

[9, 19] 26 Am Jur 2d, Eminent Domain §§ 38, 39.
    27 Am Jur 2d, Eminent Domain §§ 402, 408, 506.

[10, 24] 26 Am Jur 2d, Eminent Domain §§ 32, 42, 120.

[15-18] 71 Am Jur 2d, State and Local Taxation §§ 45, 70.

[19] 26 Am Jur 2d, Eminent Domain §§ 7, 8, 26, 150.
    27 Am Jur 2d, Eminent Domain § 376.

[21] 26 Am Jur 2d, Eminent Domain §§ 20, 45-48, 51, 54, 119, 123,
    125, 136, 137, 141.

[25] 26 Am Jur 2d, Eminent Domain §§ 34, 37.

violate the Constitution, and social and cultural environments are not protected by the Michigan Environmental Protection Act.

1. All are agreed that the provision of the Constitution that private property shall not be taken for public use without just compensation first being paid or secured forbids condemnation except to further a public use or purpose. The plaintiffs urge a distinction between "use" and "purpose", but the terms have been used interchangeably in Michigan statutes and decisions in an effort to describe the protean concept of public benefit. The term "public use" has not received a narrow or inelastic definition by the Court, and indeed changes with changing conditions of society. The heart of this dispute is whether the proposed condemnation is for the primary benefit of the public or the private user.

2. The Economic Development Corporations Act is part of comprehensive legislation which attempts to provide for the general health, safety, and welfare. One of its objectives is to alleviate unemployment by assisting industry. To further the objectives of the act, the Legislature has authorized municipalities to acquire property by condemnation in order to provide industrial and commercial sites and the means of transfer from the municipality to private users. The Legislature has determined that governmental action of the type contemplated here meets a public need and serves an essential public purpose. The Court's role after such a determination is made is limited: the determination should not be reversed except in instances where it is palpably and manifestly arbitrary and incorrect. When a legislature speaks, the public interest has been declared in terms well-nigh conclusive.

3. The Legislature has delegated the authority to determine whether a particular project constitutes a public purpose to the governing body of the municipality involved. The plaintiffs in this case challenged the necessity for the taking of the land. The city presented evidence of the severe economic conditions facing the residents of the city and state, the need for new industrial development to revitalize local industries, the economic boost the project would provide, and the lack of other adequate available sites to implement the project. The benefit to be received by the municipality is a clear and significant one and is sufficient to satisfy the Court that such a project was an intended and a legitimate object of the Legislature when it allowed municipalities to exercise condemnation powers even though a private party will also, ultimately, receive a signifi-

cant benefit as an incident. Where the power of condemnation is exercised in a way that benefits specific and identifiable private interests, the claim that the public interest is the predominant interest being advanced is inspected with heightened scrutiny. The public benefit cannot be speculative or marginal but must be clear and significant to be within the legitimate legislative purpose. This project is warranted because its significance for the people of Detroit and the state has been demonstrated.

4. The Michigan Environmental Protection Act is stated to be "for the protection of the air, water and other natural resources and public trust therein from pollution, impairment or destruction", and the reference to "air, water and other natural resources" appears in several sections of the act and in its title. Given its plain meaning, the term "natural resources" does not encompass a "social and cultural environment". The "social and cultural environments" are matters not within the purview of the Michigan Environmental Protection Act and are outside its legislative intent.

The judgment of the trial court is affirmed.

Justice Fitzgerald, joined by Justice Ryan, dissented because he believes that the proposed condemnation clearly exceeds the government's authority to take private property through the power of eminent domain. He concurred in the discussion of the issue of the environmental protection act.

1. The city attaches great importance to the explicit legislative findings in the Economic Development Corporations Act that unemployment is a serious problem and that it is necessary to encourage industry in order to revitalize the economy of the state, and to the legislative declaration in the act that the use of the power of eminent domain shall be considered necessary for public purposes and for the benefit of the public. While such legislative pronouncements are entitled to great deference, determination whether a taking is for a public or a private use is ultimately a judicial question.

2. There is simply no precedent for this decision in Michigan cases. Slum clearance cases in which it has been held that the taking is for a public use even though the property taken is eventually transferred to private parties, while superficially similar in respect to the disposition of the property, do not justify the condemnation in this case. The public purpose in slum clearance is the benefit to the public health and welfare that results from the elimination of existing blight, even though the ultimate disposition of the property will benefit private interests; but in this case it is only through the acquisi-

tion and use of the property by General Motors that the "public purpose" of promoting employment can be achieved, and thus the economic benefits of the project are incidental to the private use of the property. Cases that have found the objective of economic development to be a sufficient "public purpose" to support the expenditure of public funds in aid of industry are not applicable here, because public purpose in a context of governmental taxing and spending powers cannot be equated with that term in connection with the power of eminent domain. Condemnation places the burden of aiding industry on the few, who are likely to have limited power to protect themselves from the excesses of legislative enthusiasm, whereas the burden of taxation is distributed over the great majority, leading to a more effective check on the improvident use of public funds.

3. Decisions from other states on this subject are instructive but are not controlling of the disposition of this case because each is presented against the background of a particular state's constitutional and statutory framework, each has its peculiar facts, making comparison difficult, and each is decided in the context of the state's body of case law which may have given either a broad or narrow interpretation to the term "public use". Michigan law seems more consistent with that of states that give a more limited construction to the term. The scope of "public use" in Michigan is quite similar to that in states that have rejected development projects on the theory that they would improve general economic conditions. The cases in other states that have allowed condemnation solely because of the economic benefits of development are distinguishable in that it was the governmental unit that selected the site for commercial or industrial development, whereas in this case General Motors solicited the city for its aid in locating a site.

4. The evolution of the concept of public use has not eroded our historic protection against the taking of private property for private use to the degree sanctioned by the Court's decision in this case. The decision that the prospect of increased employment, tax revenue, and general economic stimulation makes a taking of private property for transfer to another private party sufficiently "public" to authorize the use of the power of eminent domain means that there is virtually no limit to the use of condemnation to aid private businesses.

Justice Ryan also wrote a separate dissenting opinion. In this extraordinary case, the Court, by its decision, has altered the law of eminent domain in this state in a most significant way and seriously jeopardized the security of all private property

ownership. This case will stand for judicial approval of munici-pal *condemnation of private property for private use*, and puts the judicial imprimatur upon government action taken under the policy of the end justifying the means.

1. The central issue is the right of government to expropriate property from those who do not wish to sell for the use and benefit of a strictly private corporation. It is not disputed that this action was authorized by statute, the Economic Development Corporations Act. The question is whether such authori-zation is constitutional.

2. The state constitution uses the term "public use" in the taking clause dealing with the power of eminent domain, and the term "public purposes" in the taxation provision giving cities and villages the power to levy taxes. Well over a century ago, a clear line was drawn between the powers of eminent domain and taxation, setting the jurisprudences of the taking clause and the taxing clause on separate, independent courses. What is "public" for one is not necessarily "public" for the other. The distinction has been consistently maintained by the Supreme Court until now; in failing to make it in this case the Court loses its way. The early cases construed "public purpose" for taxation more narrowly than "public use" for eminent domain, but the principle that they are different remains unaffected in later cases. Since the early decisions the taxing power has been significantly expanded, so that today, when dealing with eminent domain unrelated to avenues of com-merce, it is reasonable, indeed necessary, to conclude that, for purposes of aiding private corporations, eminent domain is more restrictive than the power of taxation.

3. The distinction between "public use" for eminent domain and "public purpose" for taxation is further reflected in the Legislature's proper role, as the Court has defined it, in describ-ing the ambits of the terms. Cases on taxation abound with statements of deference to legislative determinations respecting the boundaries of "public purpose". On the other hand, it has always been the case that the Court has accorded little or no weight to legislative determinations of "public use". It has repeatedly said that the question is a *judicial* question. It is true that the Fifth Amendment taking clause applies to the states through the Fourteenth Amendment due process clause and that the Supreme Court of the United States has adopted a deferential standard of review in construing the Fourteenth Amendment, but the deference is paid not to the decisions of state legislatures but to the judgments of state courts. The distinction is critical and, in this case, makes the whole differ-

ence. The Supreme Court of Michigan has never employed the minimal standard of review in an eminent domain case which is adopted in this case. Notwithstanding explicit legislative findings, the Court has always made an independent determination of what constitutes a public use for which the power of eminent domain may be utilized.

4. As a general rule, the state constitution forbids the taking of land for ultimate conveyance to a private corporation to use as it sees fit as a taking for a private use. Condemnation of property for transfer to private corporations is not wholly proscribed; there is an exception to the general rule, what might be called the instrumentality of commerce exception, which has permitted condemnation for the establishment or improvement of the avenues of commerce: highways, railroads, and canals, for example. But this case does not fall within the instrumentality of commerce exception. Cases involving that exception show three common elements explicating and justifying the use of eminent domain for private corporations: public necessity of the extreme sort, continuing accountability to the public, and selection according to facts of independent public significance.

The principle of public necessity has not to do so much with public benefit, which is always present to some extent, as with the indispensability of compelled expropriation of property to the very existence of the enterprise pursued by the private corporation. Without eminent domain, highways, railroads, canals and other instrumentalities of commerce, all of which require particular configurations of property—narrow and generally straight ribbons of land—would be impracticable; they could not exist at all. But it cannot be contended that the existence of the automotive industry or the construction of a new General Motors assembly plant requires the use of eminent domain.

Another circumstance common to the instrumentality of commerce cases is the retention of some measure of government control over the operation of the enterprise after it has passed into private hands. Public control of the use of the land after transfer to the private entity invests the taking with far greater public attributes than would exist without control and fortifies the justification for the abridgment of individual property rights. Once the land in this case is sold to General Motors, there will be no public control whatsoever over the management, or operation, or conduct of the plant to be built there. Even if employment per se is a necessity of the extreme sort, the level of employment at the new plant will be deter-

mined by private corporate managers primarily with reference, not to the regional rate of unemployment, but to profit.

The third element common to the cases is that determination of the specific land to be condemned is made without reference to the private interests of the corporation, but instead to criteria related to the public interest. For instrumentalities of commerce, particular land is condemned because of the inherent nature of those instrumentalities, which normally demand narrow and generally straight parcels of land, and because of the location of centers of population and natural conditions such as rivers. These are facts of independent public significance. The location of the land in this case is solely a result of conditions laid down by General Motors, which were designed to further its private pecuniary interest. These are facts of private significance.

5. The only authorities that even arguably support or justify the use of eminent domain in this case are the "slum clearance" cases, which hold that slum clearance is a public use for which eminent domain may be employed. However, the distinction between those cases and this one is evident. Even if circumstances made redevelopment impossible, slum clearance would be justified on the ground that clearance in itself is a public use. The object of eminent domain when used in connection with slum clearance is not to convey land to a private corporation as it is in this case, but to erase blight, danger, and disease.

6. The condemnation of land in this case is not consistent with any of the three significant elements present in the instrumentality of commerce cases, elements which together justify, in a principled manner, the use of eminent domain for private corporations. A more general principle, consonant with prior decisions of the Court and entirely contrary to the holding in this case, is contained in the state taking clause: the right to own and occupy land will not be subordinated to private corporate interests unless the use of the land condemned by or for the corporation is invested with public attributes sufficient to fairly deem the corporate activity governmental. That principle has been consistently honored by the Court until the decision in this case. The eminent domain provision of the Economic Development Corporations Act is unconstitutional both facially and as applied because it authorizes a taking of property for private use.

OPINION OF THE COURT

1. CONSTITUTIONAL LAW — EMINENT DOMAIN — PUBLIC USE.
   The Constitution requires that the power of eminent domain not be invoked except to further a public use or purpose (Const 1963, art 10, § 2).

2. EMINENT DOMAIN — PUBLIC USE — PUBLIC PURPOSE — WORDS AND PHRASES.
   The terms "public use" and "public purpose", as they pertain to the law of eminent domain, have been used interchangeably in Michigan statutes and decisions in an effort to describe the protean concept of public benefit.

3. EMINENT DOMAIN — PUBLIC USE.
   A public use, as the term is used in the law of eminent domain, changes with changing conditions of society; the right of the public to receive and enjoy the benefit of the use determines whether the use is public or private.

4. EMINENT DOMAIN — ECONOMIC DEVELOPMENT CORPORATIONS — PUBLIC PURPOSE.
   The Legislature has declared, in the Economic Development Corporations Act, that programs to alleviate and prevent conditions of unemployment and to preserve and develop industry and commerce are essential public purposes, and has authorized municipalities to acquire property by condemnation to provide industrial and commercial sites and the means of transfer from the municipality to private users; the determination of what constitutes a public purpose is primarily a legislative function (MCL 125.1602, 125.1622; MSA 5.3520[2], 5.3520[22]).

5. CONSTITUTIONAL LAW — EMINENT DOMAIN — INHERENT POWER.
   Eminent domain is an inherent power of the sovereign of the same nature as, albeit more severe than, the power to regulate the use of land through zoning or the prohibition of public nuisances.

6. EMINENT DOMAIN — ECONOMIC DEVELOPMENT CORPORATIONS — PUBLIC PURPOSE.
   Condemnation by the City of Detroit of land in the city for eventual conveyance by the Detroit Economic Development Corporation to General Motors Corporation for construction of new factories on the land *held* to be an intended and a legitimate object of the Legislature when it allowed municipalities to exercise condemnation powers in the Economic Development Corporations Act, even though a private party will also, ultimately, receive a benefit as an incident, where the benefit to be

received by the municipality invoking the power is a clear and significant one (MCL 125.1602, 125.1622; MSA 5.3520[2], 5.3520[22]).

7. EMINENT DOMAIN — ECONOMIC DEVELOPMENT CORPORATIONS — PUBLIC PURPOSE.

The power of eminent domain is restricted to furthering public uses and purposes and is not to be exercised without substantial proof that the public is primarily to be benefited; where, as in a condemnation for an economic development corporation project, the power is exercised in a way that benefits specific and identifiable private interests, a court inspects with heightened scrutiny the claim that the public interest is the predominant interest being advanced (MCL 125.1602, 125.1622; MSA 5.3520[2], 5.3520[22]).

8. ENVIRONMENT — STATUTES — NATURAL RESOURCES — SOCIAL AND CULTURAL ENVIRONMENTS.

The Michigan Environmental Protection Act is for the protection of air, water, and other natural resources, and the plain meaning of the term "natural resources" does not encompass a "social and cultural environment" (MCL 691.1201 et seq.; MSA 14.528[201] et seq.).

DISSENTING OPINION BY FITZGERALD, J.

See headnote 8.

9. EMINENT DOMAIN — PUBLIC USE.

*Legislative pronouncements that a certain use of the power of eminent domain is for a public use are entitled to great deference, but determination whether a taking is for a public use or a private use is ultimately a judicial question of law.*

10. EMINENT DOMAIN — PUBLIC PURPOSE — SLUM CLEARANCE.

*The public purpose that has been found to support the use of the power of eminent domain in slum clearance cases is the benefit to the public health and welfare that arises from the elimination of existing blight, the controlling purpose, even though the ultimate disposition of the property by resale will benefit private interests.*

11. EMINENT DOMAIN — ECONOMIC DEVELOPMENT CORPORATIONS — PUBLIC PURPOSE.

*Transfer of property taken by condemnation under the Economic Development Corporations Act to General Motors Corporation for use as a factory site cannot be considered incidental to the*

taking, because it is only through the acquisition and use of the property by General Motors that the "public purpose" of promoting employment can be achieved, and thus it is the economic benefits of the project that are incidental to the private use of the property (MCL 125.1602, 125.1622; MSA 5.3520[2], 5.3520[22]).

12. EMINENT DOMAIN — PUBLIC PURPOSE — ECONOMIC DEVELOPMENT — WORDS AND PHRASES.

"Public purpose" in the context of governmental taxing and spending power cannot be equated with that term as used in connection with the power of eminent domain; decisions that have found the objective of economic development to be a public purpose to support the expenditure of public funds in aid of industry are not appropriate authority where the question is the taking of land for an economic development corporation to convey to an industrial corporation to use as a factory site.

13. EMINENT DOMAIN — PUBLIC USE — ECONOMIC DEVELOPMENT.

The result of decisions in Michigan has been to limit the power of eminent domain to situations in which direct governmental use is to be made of the land or in which the private recipient will use it to serve the public; in this respect, the scope of "public use" in Michigan is quite similar to that in states that have rejected development projects on the theory that they would improve general economic conditions.

14. EMINENT DOMAIN — PUBLIC USE.

Condemnation of land for conveyance by an economic development corporation to General Motors Corporation for use as a factory site goes beyond the scope of the power of eminent domain in that it takes private property for a private use.

DISSENTING OPINION BY RYAN, J.

15. CONSTITUTIONAL LAW — EMINENT DOMAIN — PUBLIC USE.

A "public use" for purposes of the eminent domain clause of the Constitution is to be distinguished from a "public purpose" as that term is used in the clause conferring powers of taxation on cities and villages; what is public for one is not necessarily public for the other (Const 1963, art 10, § 2; art 7, § 21).

16. CONSTITUTIONAL LAW — EMINENT DOMAIN — PUBLIC USE.

The distinction between "public use" in the law of eminent domain and "public purpose" in the law of taxation has been consistently maintained by the Supreme Court for well over a century (Const 1963, art 10, § 2; art 7, § 21).

17. CONSTITUTIONAL LAW — EMINENT DOMAIN — PUBLIC USE.

The concept of "public purpose" for taxation, originally construed
more narrowly than the concept of "public use" for eminent
domain, has grown broader as the taxing power has been
expanded, so that today, for purposes of aiding private corpora-
tions, eminent domain is more restrictive than the power of
taxation (Const 1963, art 10, § 2; art 7, § 21).

18. CONSTITUTIONAL LAW — EMINENT DOMAIN — PUBLIC USE —
LEGISLATIVE DETERMINATION.

The Supreme Court has long accorded deference to legislative
determinations of "public purpose" in taxation cases, but has
accorded little or no weight to legislative determinations of
"public use" in eminent domain cases, holding instead that
public use is a judicial question and making an independent
determination of what constitutes a public use (Const 1963, art
10, § 2; art 7, § 21).

19. CONSTITUTIONAL LAW — EMINENT DOMAIN — PUBLIC USE — DUE
PROCESS.

The Fifth Amendment taking clause applies to the states through
the Fourteenth Amendment due process clause, and in constru-
ing the Fourteenth Amendment the Supreme Court of the
United States has adopted a deferential standard of review, but
the deference is paid to judgments of state courts, not the
decisions of state legislatures, on questions of public use under
state law; whether a use is public or private is ultimately a
judicial question (US Const, Ams V, XIV; Const 1963, art 10,
§ 2).

20. EMINENT DOMAIN — PUBLIC USE — PUBLIC PURPOSE — WORDS
AND PHRASES.

The terms "public use" and "public purpose" have indeed been
used interchangeably in the inexact language of both eminent
domain and taxation cases written by the Supreme Court, but
the different principles informing those terms have not been
interchanged.

21. EMINENT DOMAIN — INSTRUMENTALITY OF COMMERCE — PRIVATE
CORPORATIONS.

An exception to the general rule that condemnation of property
for transfer to a private corporation is forbidden, the instru-
mentality of commerce exception, has long been recognized;
this exception permits condemnation for the establishment or
improvement of the avenues of commerce—highways, railroads,
and canals, for example.

22. EMINENT DOMAIN — INSTRUMENTALITY OF COMMERCE — PRIVATE CORPORATIONS.

*Three common elements appear in the instrumentality of commerce cases justifying the use of eminent domain for private corporations: public necessity of the extreme sort, the indispensability of compelled expropriation of property to the very existence of the enterprise pursued by the private corporation; continuing accountability of the corporation to the public, the retention of some measure of government control over the operation of the enterprise after it has passed into private hands; and determination of the specific land to be condemned based upon criteria related to the public interest rather than the private interests of the corporation.*

23. EMINENT DOMAIN — INSTRUMENTALITY OF COMMERCE — PRIVATE CORPORATIONS — MANUFACTURING PLANT.

*The three common elements of the instrumentality of commerce cases which justify the condemnation of land for use by a private corporation do not appear in a case of condemnation of land for the construction of an automobile manufacturing plant where: there is no public necessity of the extreme sort, because the plant could be built somewhere without the use of condemnation; there is no continuing accountability to the public because the plant will be operated without any public control over its management or operation, and with reference not to the regional rate of unemployment, but to profit; and there is no independent public significance to the criteria used in selecting the land, but the location is a result of conditions laid down by the manufacturer to further its private pecuniary interest.*

24. EMINENT DOMAIN — PRIVATE CORPORATIONS — SLUM CLEARANCE.

*The object of eminent domain when used in connection with slum clearance is not to convey land to a private corporation, although that may ultimately be done, but to erase blight, danger, and disease, and when the area has been cleared the public purpose has been fulfilled; cases holding slum clearance to be a public purpose justifying the use of eminent domain are not authority for the use of eminent domain when the object is conveyance of the land to a private corporation for use as a factory site.*

25. CONSTITUTIONAL LAW — EMINENT DOMAIN — PRIVATE CORPORATIONS.

*The general principle in the eminent domain taking clause of the state Constitution is that the right to own and occupy land will not be subordinated to private corporate interests unless the*

*use of the land condemned by or for the corporation is invested*
*with public attributes sufficient for the corporate activity fairly*
*to be deemed governmental (Const 1963, art 10, § 2).*

*Reosti & Papakhian* for plaintiffs.

*Sylvester Delaney,* Acting Corporation Counsel,
by *Joseph N. Baltimore,* and *Honigman Miller*
*Schwartz & Cohn,* by *Jason L. Honigman, William*
*G. Christopher,* and *Norman C. Ankers,* Special
Counsel, for the City of Detroit.

*Lewis, White, Clay & Graves, P.C.,* by *David*
*Baker Lewis, Eric L. Clay,* and *Victoria A. Roberts,*
General Counsel, for the Detroit Economic Devel-
opment Corporation.

PER CURIAM. This case arises out of a plan by
the Detroit Economic Development Corporation to
acquire, by condemnation if necessary, a large
tract of land to be conveyed to General Motors
Corporation as a site for construction of an assem-
bly plant. The plaintiffs, a neighborhood associa-
tion and several individual residents of the af-
fected area, brought suit in Wayne Circuit Court
to challenge the project on a number of grounds,
not all of which have been argued to this Court.
Defendants' motions for summary judgment were
denied pending trial on a single question of fact:
whether, under 1980 PA 87; MCL 213.51 *et seq.;*
MSA 8.265(1) *et seq.,* the city abused its discretion
in determining that condemnation of plaintiffs'
property was necessary to complete the project.

The trial lasted 10 days and resulted in a judg-
ment for defendants and an order on December 9,
1980, dismissing plaintiffs' complaint. The plain-
tiffs filed a claim of appeal with the Court of
Appeals on December 12, 1980, and an application
for bypass with this Court on December 15, 1980.

We granted a motion for immediate considera-

tion and an application for leave to appeal prior to decision by the Court of Appeals to consider the following questions:

Does the use of eminent domain in this case constitute a taking of private property for private use and, therefore, contravene Const 1963, art 10, § 2?

Did the court below err in ruling that cultural, social and historical institutions were not protected by the Michigan Environmental Protection Act?

We conclude that these questions must be answered in the negative and affirm the trial court's decision.

I

This case raises a question of paramount importance to the future welfare of this state and its residents: Can a municipality use the power of eminent domain granted to it by the Economic Development Corporations Act, MCL 125.1601 *et seq.;* MSA 5.3520(1) *et seq.,* to condemn property for transfer to a private corporation to build a plant to promote industry and commerce, thereby adding jobs and taxes to the economic base of the municipality and state?

Const 1963, art 10, § 2, states in pertinent part that "[p]rivate property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law". Art 10, § 2 has been interpreted as requiring that the power of eminent domain not be invoked except to further a public use or purpose.[1] Plaintiffs-appellants urge us to distinguish between the terms "use" and "purpose", asserting

---

[1] *Shizas v Detroit,* 333 Mich 44, 50; 52 NW2d 589 (1952).

they are not synonymous and have been distinguished in the law of eminent domain. We are persuaded the terms have been used interchangeably in Michigan statutes and decisions in an effort to describe the protean concept of public benefit. The term "public use" has not received a narrow or inelastic definition by this Court in prior cases.[2] Indeed, this Court has stated that " '[a] public use changes with changing conditions of society' " and that " '[t]he right of the public to receive and enjoy the benefit of the use determines whether the use is public or private' ".[3]

The Economic Development Corporations Act is a part of the comprehensive legislation dealing with planning, housing and zoning whereby the State of Michigan is attempting to provide for the general health, safety, and welfare through alleviating unemployment, providing economic assistance to industry, assisting the rehabilitation of blighted areas, and fostering urban redevelopment.

Section 2 of the act provides:

"There exists in this state the continuing need for programs to alleviate and prevent conditions of unemployment, and that it is accordingly necessary to assist and retain local industries and commercial enterprises to strengthen and revitalize the economy of this state and its municipalities; that accordingly it is necessary to provide means and methods for the encouragement and assistance of industrial and commercial enterprises in locating, purchasing, constructing, reconstructing, modernizing, improving, maintaining, repairing, furnishing, equipping, and expanding in this state and in

[2] City of Center Line v Michigan Bell Telephone Co, 387 Mich 260; 196 NW2d 144 (1972); Gregory Marina, Inc v Detroit, 378 Mich 364; 144 NW2d 503 (1966); and In re Slum Clearance, 331 Mich 714; 50 NW2d 340 (1951).

[3] Hays v Kalamazoo, 316 Mich 443, 453-454; 25 NW2d 787; 169 ALR 1218 (1947), quoting from 37 Am Jur, Municipal Corporations, § 120, pp 734-735.

its municipalities; and that it is also necessary to encourage the location and expansion of commercial enterprises to more conveniently provide needed services and facilities of the commercial enterprises to municipalities and the residents thereof. *Therefore, the powers granted in this act constitute the performance of essential public purposes and functions for this state and its municipalities.*" MCL 125.1602; MSA 5.3520(2). (Emphasis added.)

To further the objectives of this act, the Legislature has authorized municipalities to acquire property by condemnation in order to provide industrial and commercial sites and the means of transfer from the municipality to private users. MCL 125.1622; MSA 5.3520(22).

Plaintiffs-appellants do not challenge the declaration of the Legislature that programs to alleviate and prevent conditions of unemployment and to preserve and develop industry and commerce are essential public purposes. Nor do they challenge the proposition that legislation to accomplish this purpose falls within the constitutional grant of general legislative power to the Legislature in Const 1963, art 4, § 51, which reads as follows:

"The public health and general welfare of the people of the state are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of the public health."

What plaintiffs-appellants do challenge is the constitutionality of using the power of eminent domain to condemn one person's property to convey it to another private person in order to bolster the economy. They argue that whatever incidental benefit may accrue to the public, assembling land to General Motors' specifications for conveyance to

General Motors for its uncontrolled use in profit making is really a taking for private use and not a public use because General Motors is the primary beneficiary of the condemnation.

The defendants-appellees contend, on the other hand, that the controlling public purpose in taking this land is to create an industrial site which will be used to alleviate and prevent conditions of unemployment and fiscal distress. The fact that it will be conveyed to and ultimately used by a private manufacturer does not defeat this predominant public purpose.

There is no dispute about the law. All agree that condemnation for a public use or purpose is permitted. All agree that condemnation for a private use or purpose is forbidden. Similarly, condemnation for a private use cannot be authorized whatever its incidental public benefit and condemnation for a public purpose cannot be forbidden whatever the incidental private gain. The heart of this dispute is whether the proposed condemnation is for the primary benefit of the public or the private user.

The Legislature has determined that governmental action of the type contemplated here meets a public need and serves an essential public purpose. The Court's role after such a determination is made is limited.

" 'The determination of what constitutes a public purpose is primarily a legislative function, subject to review by the courts when abused, and the determination of the legislative body of that matter should not be reversed except in instances where such determination is palpable and manifestly arbitrary and incorrect.' " *Gregory Marina, Inc v Detroit,* 378 Mich 364, 396; 144 NW2d 503 (1966).

The United States Supreme Court has held that when a legislature speaks, the public interest has been declared in terms "well-nigh conclusive". *Berman v Parker,* 348 US 26, 32; 75 S Ct 98; 99 L Ed 27 (1954).

The Legislature has delegated the authority to determine whether a particular project constitutes a public purpose to the governing body of the municipality involved.[4] The plaintiffs concede that this project is the type contemplated by the Legislature[5] and that the procedures set forth in the Economic Development Corporations Act have been followed.[6] This further limits our review.

In the court below, the plaintiffs-appellants challenged the necessity for the taking of the land for the proposed project. In this regard the city presented substantial evidence of the severe economic conditions facing the residents of the city and state, the need for new industrial development to revitalize local industries, the economic boost the proposed project would provide, and the lack of other adequate available sites to implement the project.

As Justice COOLEY stated over a hundred years ago "the most important consideration in the case of eminent domain is the necessity of accomplishing some public good which is otherwise impracticable, and * * * the law does not so much regard the means as the need". *People ex rel Detroit & Howell R Co v Salem Twp Board,* 20 Mich 452, 480-481 (1870).

When there is such public need, "[t]he abstract right [of an individual] to make use of his own property in his own way is compelled to yield to

[4] MCL 125.1610(2); MSA 5.3520(10)(2).

[5] MCL 125.1603(e); MSA 5.3520(3)(e).

[6] MCL 125.1608, 125.1609; MSA 5.3520(8), 5.3520(9).

the general comfort and protection of community, and to a proper regard to relative rights in others". *Id.* Eminent domain is an inherent power of the sovereign of the same nature as, albeit more severe than, the power to regulate the use of land through zoning or the prohibition of public nuisances.

In the instant case the benefit to be received by the municipality invoking the power of eminent domain is a clear and significant one and is sufficient to satisfy this Court that such a project was an intended and a legitimate object of the Legislature when it allowed municipalities to exercise condemnation powers even though a private party will also, ultimately, receive a benefit as an incident thereto.

The power of eminent domain is to be used in this instance primarily to accomplish the essential public purposes of alleviating unemployment and revitalizing the economic base of the community. The benefit to a private interest is merely incidental.

Our determination that this project falls within the public purpose, as stated by the Legislature, does not mean that every condemnation proposed by an economic development corporation will meet with similar acceptance simply because it may provide some jobs or add to the industrial or commercial base. If the public benefit was not so clear and significant, we would hesitate to sanction approval of such a project. The power of eminent domain is restricted to furthering public uses and purposes and is not to be exercised without substantial proof that the public is primarily to be benefited. Where, as here, the condemnation power is exercised in a way that benefits specific and identifiable private interests, a court inspects with

heightened scrutiny the claim that the public interest is the predominant interest being advanced. Such public benefit cannot be speculative or marginal but must be clear and significant if it is to be within the legitimate purpose as stated by the Legislature. We hold this project is warranted on the basis that its significance for the people of Detroit and the state has been demonstrated.

II

Plaintiffs' complaint also alleged that the proposed project violates the Michigan Environmental Protection Act (MEPA), MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.,* because it "will have a major adverse impact on the adjoining social and cultural environment which is referred to as Poletown". The trial court dismissed this claim, stating that " 'social and cultural environments' are matters not within the purview of the MEPA and outside its legislative intent". We agree.

MCL 691.1202(1); MSA 14.528(202)(1) permits maintenance of an action for declaratory and equitable relief against the state, its political subdivisions, or private entities, "for the protection of the *air, water and other natural resources* and the public trust therein from pollution, impairment or destruction". (Emphasis supplied.) The reference to "air, water and other natural resources" is also made in other sections of the act and in its title. Given its plain meaning, the term "natural resources" does not encompass a "social and cultural environment". Moreover, under the principle of *ejusdem generis,* where a statute contains a general term supplementing a more specific enumeration, the general term will not be construed to refer to objects not of like kind with those enumer-

ated. 2A Sutherland, Statutory Construction (4th ed), §§ 47.18-47.19, pp 109-114.

The decision of the trial court is affirmed.

The clerk is directed to issue the Court's judgment order forthwith, in accordance with GCR 1963, 866.3(c).

No costs, a public question being involved.

COLEMAN, C.J., and KAVANAGH, WILLIAMS, LEVIN, and BLAIR MOODY, JR., JJ., concurred.

FITZGERALD, J. *(dissenting)*. This Court today decides that the power of eminent domain permits the taking of private property with the object of transferring it to another private party for the purpose of constructing and operating a factory, on the ground that the employment and other economic benefits of this privately operated industrial facility are such as to satisfy the "public use" requirement for the exercise of eminent domain power. Because I believe the proposed condemnation clearly exceeds the government's authority to take private property through the power of eminent domain, I dissent.

I

In the spring of 1980, General Motors Corporation informed the City of Detroit that it would close its Cadillac and Fisher Body plants located within the city in 1983. General Motors offered to build an assembly complex in the city, if a suitable site could be found. General Motors set four criteria for the approval of a site: an area of between 450 and 500 acres; a rectangular shape (3/4 mile by 1 mile); access to a long-haul railroad line; and access to the freeway system. The city evaluated a number of potential sites and eventually made an in-depth study of nine sites. Eight of the sites were

found not to be feasible,[1] and the ninth, with which we are concerned, was recommended. It occupies approximately 465 acres in the cities of Detroit and Hamtramck.[2] A plan was developed to acquire the site, labeled the Central Industrial Park, under the Economic Development Corporations Act, 1974 PA 338.[3] As authorized by the statute, the project plan contemplated the use of condemnation to acquire at least some of the property within the site.

This action was brought by several residents faced with the loss of their property to condemnation as part of the project. After an expedited trial on the merits, the circuit court entered judgment for the defendants,[4] the effect of which is to allow the pending condemnation actions under the Michigan "quick take" statute, 1980 PA 87,[5] to proceed.

We granted the plaintiffs' application for leave to appeal prior to decision by the Court of Appeals and on January 29, 1981, issued an injunction prohibiting the city from proceeding with certain aspects of the condemnations pending decision in this case.

On this appeal, the plaintiffs do not challenge the city's compliance with the applicable statutes. Nor do they seek review of the circuit court's finding that the city did not abuse its discretion in

[1] Indeed, according to the Draft Environmental Impact Statement prepared by the city, none of the other eight sites studied met even the four basic criteria specified by General Motors.

[2] Although approximately 145 of the 465 acres of the project lie within the City of Hamtramck, this case involves only the portion of the project located in Detroit.

[3] MCL 125.1601-125.1627; MSA 5.3520(1)-5.3520(27).

[4] Actually there are two defendants, the city and its economic development corporation organized pursuant to 1974 PA 338. However, under that statute it is the municipality that exercises the eminent domain power within the project. MCL 125.1622; MSA 5.3520(22).

[5] MCL 213.51-213.77; MSA 8.265(1)-8.265(27).

the selection of the Central Industrial Park site over the possible alternative sites that it had studied. Rather, the appeal is limited to the plaintiffs' claims that acquisition of the site through condemnation is illegal as the taking of private property for private use, and that the circuit court erred in ruling that cultural, social, and historical institutions are not protected by the Michigan Environmental Protection Act, 1970 PA 127.[6]

The majority rejects both claims. I concur with the discussion of the environmental protection act issue, but disagree with the analysis of the eminent domain question.

II

The city attaches great importance to the explicit legislative findings in the Economic Development Corporations Act that unemployment is a serious problem and that it is necessary to encourage industry in order to revitalize the economy of this state[7] and to the legislative declaration that the use of eminent domain power pursuant to a project under the act, "shall be considered necessary for public purposes and for the benefit of the public".[8] It is undeniable that such legislative pronouncements are entitled to great deference.

[6] MCL 691.1201-691.1207; MSA 14.528(201)-14.528(207).

[7] MCL 125.1602; MSA 5.3520(2).

The majority relies heavily on § 2 of the Economic Development Corporations Act to justify its conclusion. While § 2 undoubtedly encompasses the situation before us, we agree with Justice COOLEY's statement:

"Nor is it in the power of the legislature to bind individuals by a recital of facts in a statute, to be used as evidence against the parties interested. A recital of facts in the preamble of a statute may perhaps be evidence, where it relates to matters of a public nature, as that riots or disorders exist in a certain part of the country; but where the facts concern the rights of individuals, the legislature cannot adjudicate upon them." 1 Cooley, Constitutional Limitations (8th ed), p 194.

[8] MCL 125.1622; MSA 5.3520(22).

However, determination whether a taking is for a public or a private use is ultimately a judicial question. *E.g., Lakehead Pipe Line Co v Dehn,* 340 Mich 25, 39-40; 64 NW2d 903 (1954); *Cleveland v City of Detroit,* 322 Mich 172, 179; 33 NW2d 747 (1948). Through the years, this Court has not hesitated to declare takings authorized by statute not to be for public use in appropriate cases. *E.g., Shizas v City of Detroit,* 333 Mich 44; 52 NW2d 589 (1952); *Berrien Springs Water-Power Co v Berrien Circuit Judge,* 133 Mich 48; 94 NW 379 (1903). This is as it must be, since if a legislative declaration on the question of public use were conclusive, citizens could be subjected to the most outrageous confiscation of property for the benefit of other private interests without redress. Thus, while mindful of the expression of the legislative view of the appropriateness of using the eminent domain power in the circumstances of this case, this Court has the responsibility to determine whether the authorization is lawful.

Our role was well stated by Justice COOLEY in "A Treatise on the Constitutional Limitations". Writing subsequent to the Court's decision in *People ex rel Detroit and Howell R Co v Salem Twp Board,* 20 Mich 452 (1870), he noted:

"The question what is a public use is always one of law. Deference will be paid to the legislative judgment, as expressed in enactments providing for an appropriation of property, but it will not be conclusive." 2 Cooley, Constitutional Limitations (8th ed), p 1141.

## III

Our approval of the use of eminent domain power in this case takes this state into a new

realm of takings of private property; there is simply no precedent for this decision in previous Michigan cases. There were several early cases in which there was an attempt to transfer property from one private owner to another through the condemnation power pursuant to express statutory authority. *Board of Health v Van Hoesen,* 87 Mich 533; 49 NW 894 (1891); *Ryerson v Brown,* 35 Mich 333 (1877). In each case, the proposed taking was held impermissible.

The city places great reliance on a number of slum clearance cases here and elsewhere in which it has been held that the fact that the property taken is eventually transferred to private parties does not defeat a claim that the taking is for a public use. *E.g., In re Slum Clearance,* 331 Mich 714; 50 NW2d 340 (1951); *Ellis v Grand Rapids,* 257 F Supp 564 (WD Mich, 1966). Despite the superficial similarity of these cases to the instant one based on the ultimate disposition of the property, these decisions do not justify the condemnation proposed by the city.[9] The public purpose that has been found to support the slum clearance cases is the benefit to the public health and welfare that arises from the elimination of existing blight, even though the ultimate disposition of the property will benefit private interests. As we said in *In re Slum Clearance, supra:*

"It seems to us that the public purpose of slum clearance is in any event the one *controlling* purpose of the condemnation. The jury were not asked to decide any necessity to condemn the parcels involved for any purpose of resale, but only for slum clearance. * * *

"* * * [T]he resale [abating part of the cost of clear-

---

[9] The city did not proceed under the urban renewal statutes that were the basis for the earlier decisions, and it has never sought to justify the taking of the land for this project on the ground that the area is a "slum" or "blighted" area.

ance] is not a primary purpose and is incidental and ancillary to the primary and real purpose of clearance." 331 Mich 720.[10] (Emphasis original.)

However, in the present case the transfer of the property to General Motors after the condemnation cannot be considered incidental to the taking. It is only through the acquisition and use of the property by General Motors that the "public purpose" of promoting employment can be achieved. Thus, it is the economic benefits of the project that are incidental to the private use of the property.

The city also points to decisions that have found the objective of economic development to be a sufficient "public purpose" to support the expenditure of public funds in aid of industry. *Advisory Opinion on Constitutionality of 1975 PA 301,* 400 Mich 270; 254 NW2d 528 (1977); *City of Gaylord v Gaylord City Clerk,* 378 Mich 273; 144 NW2d 460 (1966). What constitutes a public purpose in a context of governmental taxing and spending power cannot be equated with the use of that term in connection with eminent domain powers. The potential risk of abuse in the use of eminent domain power is clear. Condemnation places the burden of aiding industry on the few, who are likely to have limited power to protect themselves from the excesses of legislative enthusiasm for the promotion of industry. The burden of taxation is

[10] See also *Ellis v Grand Rapids, supra:*

"Therefore, it is obvious that the private uses which will finally be involved after a redevelopment project has been implemented are of an incidental or ancillary character, and that of paramount importance is the established public purpose of beautification and redevelopment. Once this primary purpose has been established, it is generally irrelevant what incidental or secondary purposes are involved.

*       *       *

"Once the area has been reclaimed and cleared, and is available for development, the public purpose has been fulfilled." 257 F Supp 571.

distributed on the great majority of the population, leading to a more effective check on improvident use of public funds.

## IV

The courts of other states have occasionally dealt with proposals to use condemnation to transfer property from one set of private owners to others, justified on the ground that the resulting economic benefits provide the requisite public use or public purpose. Some decisions have upheld the use of eminent domain powers on that basis;[11] others have found the proposed taking to exceed the power of the government to take private property.[12] While these cases are instructive, they are not controlling of the disposition of this case. Each is presented against the background of a particular state's constitutional and statutory framework. The peculiar facts of the development projects involved also make it difficult to compare them

[11] *Prince George's County v Collington Crossroads, Inc,* 275 Md 171; 339 A2d 278 (1975), involved an attempt by a county to condemn land for an industrial park along major highways. In *City of Minneapolis v Wurtele,* 291 NW2d 386 (Minn, 1980), the city council designated a portion of the downtown area as a "development district" pursuant to statutory authority. The city chose a developer for the project and sought to use condemnation to acquire the land.

[12] In *City of Owensboro v McCormick,* 581 SW2d 3 (Ky, 1979), the Supeme Court of Kentucky held unconstitutional an act authorizing a governmental unit to condemn private property in order to convey it through a local industrial development authority for private development for industrial and commercial purposes. The Supreme Judicial Court of Maine rendered an advisory opinion in *Opinion of the Justices,* 152 Me 440; 131 A2d 904 (1957), that the Legislature could not authorize a municipality to use the power of eminent domain to acquire private property for industrial development through transfer to other private enterprises. The use of eminent domain power to acquire land for a privately developed convention center was found impermissible in *Karesh v City Council of the City of Charleston,* 271 SC 339; 247 SE2d 342 (1978), and a plan for the use of condemnation to acquire land for an industrial development district was struck down in *Hogue v Port of Seattle,* 54 Wash 2d 799; 341 P2d 171 (1959).

with the present case. In addition, each is decided in the context of that state's body of case law which may have given either a broad or a narrow interpretation to the term "public use".

Despite the limited value of decisions in other states, several points can be made. First, while it is difficult and perhaps futile to categorize individual states as utilizing a "broad" or "narrow" interpretation of "public use" for condemnation purposes,[13] Michigan law seems most consistent with that of states that give a more limited construction to the term. While our decisions have sometimes used the phrase "public purpose" (a phrase often associated with a broad interpretation), the result of our decisions has been to limit the eminent domain power to situations in which direct governmental use is to be made of the land or in which the private recipient will use it to serve the public. The slum clearance cases are really the only significant departure from these principles, and, as noted above, those decisions have been sustained only because of the conclusion that the clearing of a blighted area is a public use. In this respect, the scope of "public use" in Michigan is quite similar to that in states that have rejected development projects on the theory that they would improve general economic conditions. *City of Owensboro v McCormick,* 581 SW2d 3 (Ky, 1979); *Karesh v City Council of the City of Charleston,* 271 SC 339; 247 SE2d 342 (1978). Certainly, we have never sustained the use of eminent domain power solely because of the economic benefits of development as have cases that allowed condemnation in similar circumstances. *Prince George's County v Collington Crossroads, Inc,* 275 Md 171, 190-191; 339 A2d

---

[13] See generally 2A Nichols, Eminent Domain (rev 3d ed), § 7.2.

278, 288 (1975); *City of Minneapolis v Wurtele*, 291 NW2d 386, 390 (Minn, 1980).[14]

Second, it is worth noting that the Maryland and Minnesota cases cited above are distinguishable in that in each it was the governmental unit that selected the site in question for commercial or industrial development. By contrast, the project before us was initiated by General Motors Corporation's solicitation of the city for its aid in locating a factory site.

## V

The majority relies on the principle that the concept of public use is an evolving one; however, I cannot believe that this evolution has eroded our historic protection against the taking of private property for private use to the degree sanctioned by this Court's decision today. The decision that the prospect of increased employment, tax revenue, and general economic stimulation makes a taking of private property for transfer to another private party sufficiently "public" to authorize the use of the power of eminent domain means that there is virtually no limit to the use of condemnation to aid private businesses. Any business enterprise produces benefits to society at large. Now that we have authorized local legislative bodies to decide that a different commercial or industrial use of property will produce greater public benefits than its present use, no homeowner's, merchant's or manufacturer's property, however productive or valuable to its owner, is immune from condemnation for the benefit of other private interests that

[14] In addition, the Minnesota court applied an extremely limited scope of review of the legislative decision regarding the existence of a public purpose. It would have reversed such a finding only on a showing of fraud or undue influence. 291 NW2d 390.

will put it to a "higher" use.[15] As one prominent commentator has written:

"It often happens that the erection of a large factory will be of more benefit to the whole community in which it is planned to build it than any strictly public improvement which the inhabitants of the place could possibly undertake; but even if the plan was blocked by the refusal of the selfish owner of a small but necessary parcel of land to part with it at any price, the public mind would instinctively revolt at any attempt to take such land by eminent domain." 2A Nichols, Eminent Domain (rev 3d ed), § 7.61[1].

The condemnation contemplated in the present action goes beyond the scope of the power of eminent domain in that it takes private property for private use. I would reverse the judgment of the circuit court.

RYAN, J., concurred with FITZGERALD, J.

RYAN, J. (dissenting). This is an extraordinary case.

The reverberating clang of its economic, sociological, political, and jurisprudential impact is likely to be heard and felt for generations. By its decision, the Court has altered the law of eminent domain in this state in a most significant way and, in my view, seriously jeopardized the security of all private property ownership.

---

[15] It would be easy to sustain the proposed project because of its large size and the extent of the claimed benefits to flow from it. The estimate is that approximately 6150 persons would be employed in the factory itself, with the generation of substantial other employment, business activity, and tax revenue as a result. However, it must be remembered that the dislocations and other costs of the project are also massive. The project plan indicates that a total of 3438 persons will be displaced by the project, that it will require the destruction of 1176 structures, and that the cost of the project to the public sector will be nearly $200,000,000.

This case will stand, above all else, despite the sound intentions of the majority, for judicial approval of municipal condemnation of private property for private use. This is more than an example of a hard case making bad law—it is, in the last analysis, good-faith but unwarranted judicial imprimatur upon government action taken under the policy of the end justifying the means.

My separate views are set down some days after the Court's 5-to-2 decision has been made and announced and the controlling and dissenting opinions of my colleagues released. I take this unusual step for a number of reasons:

—The speed with which this case was submitted, argued, considered and decided has meant preparation of opinions which, in my view, do not adequately address the constitutional issues involved.

—The ever-broadening audience for which we write may profit from a longer and more detailed analysis of the unique facts which generated this litigation in order to appreciate the economic, social, and political context in which, in my view, our constitutional precedents have been disregarded.

—Because this case so remarkably alters our jurisprudence, it is worthwhile to trace our precedent from the beginning and to note with care where and how, from this dissenting perspective, the Court departed from it.

—Finally, it seems important to describe in detail for the bench and bar who may address a comparable issue on a similarly stormy day, how easily government, in all of its branches, caught up in the frenzy of perceived economic crisis, can disregard the rights of the few in allegiance to the always disastrous philosophy that the end justifies the means.

# I

The real controversy which underlies this litiga-

tion concerns the propriety of condemning private property for conveyance to another private party because the use of it by the new owner promises greater public "benefit" than the old use. The controversy arises in the context of economic crisis. While unemployment is high throughout the nation, it is of calamitous proportions throughout the state of Michigan, and particularly in the City of Detroit, whose economic lifeblood is the now foundering automobile industry. It is difficult to overstate the magnitude of the crisis. Unemployment in the state of Michigan is at 14.2%. In the City of Detroit it is at 18%, and among black citizens it is almost 30%. The high cost of doing business in Michigan generally has driven many manufacturers out of this state and to the so-called sunbelt states on a continuing basis during the past several years. Nowhere is the exodus more steady or more damaging than from the Metropolitan Detroit area. It is appropriate to take judicial notice of the fact that the view is widely held that the Chrysler Corporation, headquartered in Detroit, is "on the ropes", surviving only because of hundreds of millions of dollars of federally insured loans. It is likewise appropriate to note judicially the commonly known and readily verifiable fact that the Ford Motor Company, the American Motors Corporation and the General Motors Corporation have all, within days, reported for the previous year the largest financial losses in their histories.

A new national administration and a reconstituted Congress are struggling to find acceptable means to assist the American automotive industry to compete with the overseas automobile manufacturing competition which is largely accountable for domestic automobile industry losses. To meet

that competition, domestic manufacturers are finding it necessary to construct new manufacturing facilities in order to build redesigned, lighter and more economical cars. That means new factories and new factory locations.

In the record of this case, the Environmental Impact Statement,[1] prepared in connection with the condemnation of the property in question in this case states:

> "The outcome of an anticipated 'no-action' decision by the cities of Detroit and Hamtramck would be that General Motors would look outside the region for a site to fulfill its needs."

The so-called "down-sized", lightweight and compact automobiles which must be designed, built, and marketed to compete with overseas competition call for modernized "new generation" manufacturing facilities, newly retooled. The Environmental Impact Statement describes the situation:

> "The purpose of the proposed action that is the subject of this EIS is to provide a suitable site for a new generation automobile assembly plant.
> "The importance of a new generation facility is to produce a more competitive product line that meets energy efficiency criteria and has the flexibility to match model production to market demand without time-consuming and costly retooling as would be required with the existing type of assembly plant.
> "The new assembly plants incorporate a primary assembly conveyor that is an overhead system, so that the engine can be put in from the bottom, rather than from the top as it is done today. They also are single-story, a design characteristic that increases the energy

[1] City of Detroit Community & Economic Development Department, Draft Environmental Impact Statement: Central Industrial Park, The Cities of Detroit and Hamtramck, Michigan (Oct. 15, 1980), p II-4 (hereinafter cited as EIS).

efficiency of the entire operation as opposed to moving auto bodies vertically through the existing multi-level assembly plants."

The desirability of a "new generation facility" to enable General Motors Corporation in particular to recoup its losses and recapture its competitive edge is clear in view of the fact that for decades General Motors has been operating two manufacturing facilities in the City of Detroit of the "old generation" vintage. About the desirability of replacing old plants, the Economic Impact Statement states:

"Another problem with existing assembly plants is their inability to meet the hydrocarbon emission control levels that are due to become more stringent in the 1980's. The new generation of facilities are designed to eliminate this problem.

"It is much less costly to build a new plant than to try to retrofit an old plant. In addition, the existing plant sites are generally too small for a new facility that is single rather than multi-storied. The result is that the automotive manufacturers have been turning to 'green field' suburban locations as their most economically feasible siting option."

For those reasons and others, General Motors concluded that it would terminate its Cadillac and Fisher Body manufacturing operations at the old facilities in Detroit by 1983 and build a new plant. Needless to say, the fundamental consideration governing the location of the new facility was the corporation's enlightened self-interest as a private, profit-making enterprise.

It was in this economic context, fueled with talk of removal of its long-established Cadillac and Fisher Body manufacturing operations from the Detroit area and the construction of a new 3-mil-

lion-square-foot plant in a sunbelt state, that in 1980 General Motors made its first overture to the City of Detroit about finding a suitable plant site in the city.[2] The Environmental Impact Statement summarizes the situation thus:

"In recognition of the need to improve the competitive position of the domestic automobile industry, the President has proposed an Auto Recovery Program. In Detroit, the City has been intensively working with Chrysler Corporation and General Motors Corporation to assist, where possible, in each company's efforts to make their aging, and for the most part obsolete, Detroit facilities more competitive. Among the successful results of this joint planning was the receipt by the City of an offer from General Motors to construct a modern 3 million square foot assembly complex at a cost of $500,000,000 to replace their aging Cadillac Assembly and Fisher Body plants that General Motors proposes to close in 1983. To Detroit, this provided the opportunity to retain 6,150 jobs which would have otherwise been permanently lost to the Detroit area if General Motors were forced by size constraints to move to a 'green field' location. The proposed facility also represents a potential $15,000,000 in new property tax revenues." *Id.,* pp II-4 to II-5.

It was, of course, evident to all interested observers that the removal by General Motors of its Cadillac manufacturing operations to a more favorable economic climate would mean the loss to

[2] Testifying before the circuit court in this matter, Coleman A. Young, Mayor of the City of Detroit, stated:

"*Q [By Mr. Honigman]:* When did you first undertake to study this situation?

"*A* It was after a visit to my office by the chairman of the board of General Motors, Tom Murphy, several months ago, in which he indicated that General Motors was interested in building a plant within the city limits, if we could provide the cleared land. I had previously requested from both Ford and General Motors, as well as Chrysler, that if in the future they had any plans to expand or build new plants, that the City of Detroit be given the first opportunity. Mr. Murphy's visit was in reaction to that previous request."

Detroit of at least 6,000 jobs[3] as well as the con-comitant loss of literally thousands of allied and supporting automotive design, manufacture and sales functions. There would necessarily follow, as a result, the loss of millions of dollars in real estate and income tax revenues. The darkening picture was made even bleaker by the operation of other forces best explained by the social sciences, including the city's continuing loss of its industrial base and the decline of its population.[4]

Thus it was to a city with its economic back to the wall that General Motors presented its highly detailed "proposal" for construction of a new plant in a "green field" location in the City of Detroit. In addition to the fact that Detroit had virtually no "green fields", the requirements of the "proposal" were such that it was clear that no existing loca-tion would be suitable unless the city acquired the requisite land one way or another and did so within the General Motors declared time schedule.

---

[3] Testimony of Mayor Young.

[4] Moreover, the problem is not indigenous to Detroit, but part of the broader migration of business and people from the older, industrial cities of the Northeast and Midwest to the so-called sunbelt; to Detroit's Mayor Young those factors impressed the project with symbolic value of national dimension:

"I think it transcends in its economic and social potential for this community the Renaissance or any other development that has taken place. What we have here is a development that is being watched by older industrial cities in the Midwest and Northeast across the nation; * * *. If we can assemble this land, doing justice to those who live there, both the merchants and the residents, and provide a strengthening industrial base for our state, I think we can open up an approach for other northern industrial cities who are landlocked as we are, who have lost population, to relocate and to reassemble and to attract industry. * * * I consider it of great importance, the ability of this city to survive, and to the ability of other cities in the industrial belt, that is the Midwest, and the Northeast, all these cities face exactly the same problem as Detroit does, escalating unemployment and decreasing population, the exodus of industry." Trial Testimony of Mayor Coleman A. Young.

As compelling as these concerns are, they hardly support the constitutionality of the governmental action at issue here.

The corporation told the city that it must find or assemble a parcel 450 to 500 acres in size with access to long-haul railroad lines and a freeway system with railroad marshalling yards within the plant site. As both General Motors and the city knew at the outset, no such "green field" existed. Unquestionably cognizant of its immense political and economic power, General Motors also insisted that it must receive title to the assembled parcel by May 1, 1981.

In a most impressive demonstration of governmental efficiency, the City of Detroit set about its task of meeting General Motors' specifications. Nine possible sites were identified and suggested to General Motors. Only one was found adequate—a parcel consisting of 465 acres straddling the Detroit-Hamtramck border that has come to be known as Central Industrial Park (CIP).

In July, 1980, the general outlines of the proposal to condemn property to meet General Motors' demands were submitted to the Detroit Common Council, which promptly approved the boundaries of CIP. The city had already begun to purchase property in contemplation of CIP's establishment. Approval of the CIP boundaries by the Common Council set in motion other activities: surveying in the area was begun, appraisals of the affected properties were made, and two major documents were prepared: "Project Plan: Central Industrial Park" and "Draft Environmental Impact Statement: Central Industrial Park, The Cities of Detroit and Hamtramck, Michigan" (EIS). On September 30, 1980, the completed project plan was approved by the Detroit Economic Development Corporation. Two weeks later a public hearing was held on the then proposed CIP and the next day, October 15, 1980, the Environmental Impact Statement was issued. On October 29, 1980

the Detroit Community and Economic Development Department, pursuant to the mandate of § 9 of 1974 PA 338,[5] sent a letter to the Detroit Common Council recommending that the council approve the project plan with suggested amendments for the CIP. Two days later, the council followed the recommendation, passed a resolution approving the project plan with minor modifications, and declared in the resolution "that said project constitutes a public purpose" · and "is hereby determined to be for the use and benefit of the public". On November 3, 1980 the mayor of the City of Detroit signed the resolution.

Behind the frenzy of official activity was the unmistakable guiding and sustaining, indeed controlling, hand of the General Motors Corporation. The city administration and General Motors worked in close contact during the summer and autumn of 1980 negotiating the specifics for the new plant site. The negotiations culminated in a letter dated October 8, 1980 from Thomas A. Murphy, Chairman of the Board of Directors of General Motors, to Mayor Coleman A. Young and Mr. Howard Woods, Chairmen of the Economic Development Corporations of the cities of Detroit and Hamtramck, respectively.[6]

---

[5] MCL 125.1609; MSA 5.3520(9).

[6] So clearly does the letter demonstrate the control being exercised over the condemnation project by General Motors, that it is reproduced here in its entirety.

"GENERAL MOTORS CORPORATION

"October 8, 1980

"The Honorable Coleman A. Young
Chairman
Economic Development Corpora-
   tion of the City of Detroit
Detroit, Michigan 48226

Mr. Howard Woods
Chairman
Economic Development Corpora-
   tion of the City of Hamtramck
Hamtramck, Michigan 48212

"Gentlemen:

"This letter will confirm General Motors' public statements and our many discussions held during the last several months, and will serve to express the commitment of General Motors Corporation to the cities of Detroit and Hamtramck to cause an automotive assembly plant to be built on the Detroit/Hamtramck site if the site criteria requirements detailed on the attachment to this letter are accomplished.

"These site criteria have been prepared by General Motors' Site Selection Committee, and are the requirements necessary for General Motors to construct and complete an assembly plant by May 1, 1983.

"If the site criteria are acceptable to the Economic Development Corporations, please indicate your acknowledgement to that effect by executing and returning the attached copy of this letter to us by October 31, 1980.

"General Motors Corporation will then enter into a mutually satisfactory development agreement with the Economic Development Corporations. A draft of this development agreement should be delivered to General Motors Corporation by November 30, 1980 and shall set forth the conditions for satisfaction of the site criteria and specify, among other matters, the financing methods, procedures and timing required to complete the development of the site. When the conditions of the site criteria are satisfied as provided for in the development agreement, General Motors Corporation will purchase the site and cause an automotive assembly plant of approximately 3,000,000 square feet, and employing approximately 6,000 people, to be built upon this site.

"We know how difficult it is to accomplish a project of this magnitude without inconveniencing some individuals. However, we know that this site presents the fewest such problems of any location in the City. I also know you will address the concerns of the individuals in the area with great care and concern. I firmly believe the prospect of retaining some 6,000 jobs, and the attendant revitalization of these communities, is a tremendous challenge. But it also is an opportunity and a responsibility which none of us can ignore. Working together, in a spirit of cooperation, I feel confident we can accomplish it.

"Very truly yours,

"(s) T.A. Murphy

"Thomas A. Murphy
Chairman

"Attachments

Attached to the letter from Mr. Murphy were eight pages of "site criteria requirements", all established by General Motors, to which the cities of Detroit and Hamtramck were required to agree, as a condition precedent to General Motors' "enter[ing] into a *mutually* satisfactory development agreement with the Economic Development Corporations". (Emphasis added.) The cities agreed.

Among the more publicized of the criteria imposed by General Motors was the requirement that "[t]itle to the entire site and the rail marshalling yard must be vested in the City of Detroit by May 1, 1981". In light of that demand, the uncommon speed and efficiency with which the city moved to establish CIP and initiate proceedings to condemn the affected property is more understandable.

It is the less publicized site criteria prescribed by General Motors, however, and incorporated in the approved project plan by the City of Detroit, which suggest the withering economic clout of the country's largest auto firm. An example is the requirement that the economic development corporations, which are nothing more than the alter egos of the municipalities involved, must "provide for the construction and upgrading of site perimeter roads". This entails relocation and extension of East Grand Boulevard, which now runs through CIP; the widening of existing roads and construc-

---

"The undersigned have examined the site criteria as specified and hereby accept the terms and conditions thereof:

"ECONOMIC DEVELOPMENT             ECONOMIC DEVELOPMENT
CORPORATION OF CITY              CORPORATION OF CITY
OF DETROIT                       OF HAMTRAMCK

"Coleman A. Young, Chairman      Howard Woods, Chairman".

tion of new roads to form a ring road around CIP; "[a]ppropriate modification of I-94 access ramps and service roads"; and erection of an "[a]ppropriate street lighting system around the perimeter road". The projected cost of these improvements is $23.5 million. In addition, it was decreed that "General Motors will not be responsible for absorbing the penalty of approximately $3.5 million for underground [utility] service versus overhead service, as required by the Public Lighting Department of the City of Detroit". Furthermore, the economic development corporations agreed "[t]o dispose of, at their expense, hazardous and toxic waste materials which are found on the site". Of course, the cities are also required by law to pay just compensation to those dislocated by CIP. In all, the projected *public* cost of preparing a site agreeable to the board of directors of General Motors is over $200 million.[7] Remarkably, the site will be sold to General Motors for little more than $8 million.[8]

---

[7] A "Statement of Project Cost" is found in the Project Plan:

*"Statement of Project Cost*

"A. The following are the projected public sector costs associated with the project:

| | |
|---|---|
| Acquisition | $ 62,000,000 |
| Relocation | 25,000,000 |
| Demolition | 35,000,000 |
| Roads | 23,500,000 |
| Rail | 12,000,000 |
| Other Site Preparation | 38,700,000 |
| Professional Services | 3,500,000 |
| Total | $199,700,000" |

Project Plan, p 11.

When the Detroit Common Council approved the Project Plan, the cost of relocation was increased to $25,750,000, bringing the total public sector cost to over $200 million.

[8] The attachment to the letter discussed in the text accompanying fn 5, *supra,* contains the following provision:

"Marketable title shall be conveyed to General Motors Corporation

The long shadow of this public accommodation of a private manufacturing development was adumbrated by a provision in the site criteria document, attached to GM Chairman Murphy's letter, which states:

"*Taxes*
"The Cities of Detroit and Hamtramck shall establish a Plant Rehabilitation District pursuant to the terms of Public Act 198 Michigan Acts of 1974, as amended, being MCL 207.551 *et seq.;* MSA 7.800(1) *et seq.,* which shall include maximum allowable tax abatement under said law for a period of 12 years."

The evidence then is that what General Motors wanted, General Motors got. The corporation conceived the project, determined the cost, allocated the financial burdens, selected the site, established the mode of financing, imposed specific deadlines for clearance of the property and taking title, and even demanded 12 years of tax concessions.[9]

From the beginning, construction of the new

by warranty deeds, on a phased basis * * * for a total consideration equal to $18,000 multiplied by the number of acres of the plant site * * *."

[9] What is reported here is not meant to denigrate either the role or the good faith of General Motors Corporation. It is a private, profit-making enterprise. Its managers are answerable to a demanding board of directors who, in turn, have a fiduciary obligation to the corporation's shareholders. It is struggling to compete worldwide in a depressed economy. It is a corporation having a history, especially in recent years, of a responsible, even admirable, "social conscience". In fact, this project may well entail compromises of sound business dictates and concomitant financial sacrifices to avoid the worsening unemployment and economic depression which would result if General Motors were to move from the state of Michigan as other major employers have. The point here is not to criticize General Motors, but to relate accurately the facts which attended the city's decision to condemn private property to enable General Motors to build a new plant in Detroit and to "set the scene" in which, as will be seen hereafter, broad-based support for the project was orchestrated in the state, fostering a sense of inevitability and dire consequence if the plan was not approved by all concerned. General Motors is not the villain of the piece.

assembly plant in Detroit was characterized by the
city administration as a do or die proposition.
Accordingly, the city, aided by the Michigan
"quick-take" statute,[10] marshalled and applied its
resources and power to insure that CIP was a *fait
accompli* before meaningful objection could be reg-
istered[11] or informed opposition organized. Faced
with the unacceptable prospect of losing two auto-
motive plants and the jobs that go with them, the
city chose to march in fast lock-step with General
Motors to carve a "green field" out of an urban
setting which ultimately required sweeping away a
tightly-knit residential enclave of first- and second-
generation Americans, for many of whom their
home was their single most valuable and cherished
asset and their stable ethnic neighborhood the
unchanging symbol of the security and quality of
their lives.

It is easy to underestimate the overwhelming
psychological pressure which was brought to bear
upon property owners in the affected area, espe-
cially the generally elderly, mostly retired and
largely Polish-American residents of the neighbor-
hood which has come to be called Poletown. As the
new plant site plans were developed and an-
nounced, the property condemnation proceedings

[10] 1980 PA 87; MCL 213.51-213.77; MSA 8.265(1)-8.265(27). The act
is procedural in nature and "does not confer the power of eminent
domain" or "prescribe or restrict the purposes for which or the
persons by whom that power may be exercised", MCL 213.52; MSA
8.265(2).

[11] This approach was reflected in and abetted by an amendment to
the Project Plan approved by the Detroit Common Council on October
31, 1980. The amendment reads as follows:

"The intent of the development plan is to encourage relocation
from the project area within 90 days of notification by the City to
vacate. In order for property owners and tenants, however, to be
informed of the latest date allowed for vacating the premises within a
particular area of the project, dates shall be posted monthly by the
City at the District Council office and shall be included in the District
Council newsletters."

under the "quick-take" statute begun and the demolitionist's iron ball razed neighboring commercial properties such as the already abandoned Chrysler Dodge Main plant, a crescendo of supportive applause sustained the city and General Motors and their purpose. Labor leaders, bankers, and businessmen, including those for whom a new GM plant would mean new economic life, were joined by radio, television, newspaper and political opinion-makers in extolling the virtues of the bold and innovative fashion in which, almost overnight, a new and modern plant would rise from a little known inner-city neighborhood of minimal tax base significance. The promise of new tax revenues, retention of a mighty GM manufacturing facility in the heart of Detroit, new opportunities for satellite businesses, retention of 6,000 or more jobs, and concomitant reduction of unemployment, all fostered a community-wide chorus of support for the project. It was in such an atmosphere that the plaintiffs sued to enjoin the condemnation of their homes.

The judiciary, cognizant of General Motors' May 1 deadline for the city's taking title to all of the property, moved at flank speed. The circuit court conducted a trial on defendants' motion to dismiss plaintiffs' complaint from November 17 to December 2, 1980, and the decision to dismiss the complaint was made on December 9, 1980. Application for leave to appeal prior to decision by the Court of Appeals was received in this Court on December 15, 1980. However, the trial transcript was not received by us until January 5, 1981. We promptly convened, conferred, and granted leave to appeal on January 29, 1981. The case was argued on March 3, 1981.

In less than two weeks, the lead opinions were

filed by this Court and released. It is in such
circumstances that we were asked to decide, and
did decide, an important constitutional issue hav-
ing towering implications both for the individual
plaintiff property owners and for the City of De-
troit and the state alike, to say nothing of the
impact upon our jurisprudence.

I now turn to set down separately my under-
standing of the law which governs this case and
the outcome it ought to have dictated. My dis-
agreement with my colleagues in the majority,
while vigorous, is nonetheless respectful. Vigorous,
because I think the unintended jurisprudential
mischief which has been done, if not soon rectified,
will have echoing effects far beyond this case, and
respectful because the crushing burden of litigation
which this Court must address daily did not afford
adequate time for sufficient consideration of the
complex constitutional issues involved within the
two-week deadline the Court set for itself for sub-
mission, consideration, and decision of the case.

## II

### THE ISSUE

Stripped of the justifying adornments which
have universally attended public description of
this controversy, the central jurisprudential issue
is the right of government to expropriate property
from those who do not wish to sell for the use and
benefit of a strictly private corporation. It is not
disputed that this action was authorized by stat-
ute. The question is whether such authorization is
constitutional.

The Economic Development Corporations Act,
enacted in 1974, provides for the formation of
municipal economic development corporations. The

corporations serve as conduits for effectuation of the salutary purposes of the act, which are expressed in § 2:

"There exists in this state the continuing need for programs to alleviate and prevent conditions of unemployment, and that it is accordingly necessary to assist and retain local industries and commercial enterprises to strengthen and revitalize the economy of this state and its municipalities; that accordingly it is necessary to provide means and methods for the encouragement and assistance of industrial and commercial enterprises in locating, purchasing, constructing, reconstructing, modernizing, improving, maintaining, repairing, furnishing, equipping, and expanding in this state and in its municipalities; and that it is also necessary to encourage the location and expansion of commercial enterprises to more conveniently provide needed services and facilities of the commercial enterprises to municipalities and the residents thereof. Therefore, the powers granted in this act constitute the performance of essential public purposes and functions for this state and its municipalities." MCL 125.1602; MSA 5.3520(2).

The act empowers the corporations, among other things, to acquire "by gift or purchase" the necessary property for a "project", borrow money and issue revenue bonds to finance a project, and lease or sell a project. The corporations do not hold the power of eminent domain. That remains in the hands of municipalities. Section 22 of the act reads:

"A municipality may take private property under Act No. 149 of the Public Acts of 1911, as amended, being sections 213.21 to 213.41 of the Michigan Compiled Laws, for the purpose of transfer to the corporation, and may transfer the property to the corporation for use in an approved project, on terms and conditions it deems appropriate, *and the taking, transfer, and use shall be considered necessary for public purposes and*

*for the benefit of the public."* MCL 125.1622; MSA
5.3520(22). (Emphasis added.)

It is under this section that the property was
taken to establish CIP and it is this section whose
constitutionality is examined here.

## III

### PUBLIC USE AND PUBLIC PURPOSE DISTINGUISHED

Section 2 of art 10 of the state constitution, the
taking clause, provides in pertinent part, "[p]rivate
property shall not be taken for public *use* without
just compensation". (Emphasis added.) Although
not stated affirmatively, it is axiomatic that the
provision proscribes the taking of private property
for private use. See, *e.g., Soper v Ridgemoor Coun-
try Club,* 275 Mich 129, 132; 266 NW 415 (1936);
see, generally, 2A Nichols, Eminent Domain (rev
3d ed), § 7.1[2], pp 7-14 to 7-15.

Not to be confused is a separate provision of our
constitution respecting an altogether different gov-
ernmental power, one not in question in this case
—the power of taxation. That provision limits the
use of the power, including the expenditure of tax
revenues, to "public purposes": "Each city and
village is granted power to levy * * * taxes for
public purposes". (Emphasis added.) Const 1963,
art 7, § 21.

Well over a century ago, a clear line of demarca-
tion was drawn between the powers of eminent
domain and taxation, setting the jurisprudences of
the taking clause and, if you will, the "taxing
clause" on separate, independent courses. What is
"public" for one is not necessarily "public" for the
other:

"Reasoning by analogy from one of the sovereign powers of government to another, is exceedingly liable to deceive and mislead. An object may be *public* in one sense and for one purpose, when in a general sense and for other purposes, it would be idle and misleading to apply the same term. All governmental powers exist for public purposes, but they are not necessarily to be exercised under the same conditions of public interest. * * * The sovereign power of taxation is employed in a great many cases where the power of eminent domain might be made more immediately efficient and available, if constitutional principles would suffer it to be resorted to; but each of these powers has its own peculiar and appropriate sphere, and the object which is *public* for the demands of one is not necessarily of a character to permit the exercise of another." *People ex rel Detroit & Howell R Co v Salem Twp Board,* 20 Mich 452, 477-478 (1870) (COOLEY, J.).

The distinction established by Justice COOLEY in *Salem*[12] has been consistently maintained by this Court, with the exception of dicta,[13] until now. It is in failing to make this distinction that, in my view, the Court loses its way.

The issue before the *Salem* Court was whether townships could use tax revenues to lend credit to a private railroad company for the purpose of building a railway line; that is, is railroad construction a public purpose? The Court answered no.

"[T]he term 'public purposes,' as employed to denote

[12] In fact, it appears that Justice COOLEY did not establish the distinction but merely reaffirmed it. In the annotator's note to an earlier case, *Swan v Williams,* 2 Mich 427 (1852), it is stated:
"It is obvious, therefore, that while neither the right of eminent domain nor of taxation purports to be exercised except for a public purpose, other and distinct considerations determine what kind of a public purpose it must be, to justify the exercise of either power." *Id.,* 428.

[13] See *Gregory Marina, Inc v Detroit,* 378 Mich 364, 393-395; 144 NW2d 503 (1966) (plurality opinion).

the objects for which taxes may be levied, has no
relation to the urgency of the public need, or to the
extent of the public benefit which is to follow." *Id.,* 485.

Concededly, much has changed since these
words were written in 1870. For example, the
concept of public purpose as it relates to govern-
ment's taxing power has been greatly enlarged.
See, *e.g., City of Gaylord v Gaylord City Clerk,* 378
Mich 273; 144 NW2d 460 (1966);[14] *cf. Advisory
Opinion on Constitutionality of 1976 PA 295, 1976
PA 297,* 401 Mich 686; 259 NW2d 129 (1977)
(RYAN, J.).[15] In fact, in *Salem,* Justice COOLEY
construed the concept of public purpose (taxation)
more *narrowly* than the concept of public use
(eminent domain).[16]

---

[14] "It can scarcely be questioned that the benefits resulting from a
plywood plant that are conjured by plaintiff would be general to the
public in the Gaylord area, thereby meeting the test of public use set
forth in *Hays v Kalamazoo* [316 Mich 443; 25 NW2d 787 (1947)]." 378
Mich at 301.

[15] In the *Advisory Opinion* case, we were concerned with "public
internal improvements" within the meaning of Const 1963, art 3, § 6.
Government involvement with such improvements is primarily finan-
cial and entails the expenditure of public monies. The construction of
the term "public internal improvements", therefore, involves the
same considerations as those affecting construction of "public pur-
pose". Accordingly, in *Advisory Opinion,* I said:

"At the outset it should be noted that this Court has recognized
that the determination of what constitutes a public purpose is primar-
ily the responsibility of the Legislature, and that the concept of public
purpose has been construed quite broadly in Michigan." 401 Mich at
696.

To support the proposition, I cited seven cases. *Id.* The constitu-
tional issue in each of the cases pertained to, in one way or another,
the *proper expenditure of tax revenues. Not one of the cases involved*
the power of eminent domain.

[16] This can be explained by the fact that the comparison was done
in the context of railroad building for which exception to general
eminent domain principles was made in the common law.

"This right [of eminent domain], it has been held, may be exercised
on behalf of railways in the hands of private parties. But there can be
no doubt, I think, that this holding was a considerable modification of
common law principles". 20 Mich at 479.

The railroad exception, like those pertaining to other instrumentali-

Nonetheless, the principle that public purpose and public use are different remains unaffected. The principle was reaffirmed by this Court, again speaking through Justice COOLEY, in *Ryerson v Brown*, 35 Mich 333 (1877), a case involving eminent domain:

"The rules which underlie taxation do not necessarily govern the case [of eminent domain]. Taxation is for those purposes which properly and legitimately are designated public purposes; but the authority of the state to compel the sale of individual property for the use of enterprises in which the interest of the public is only to be subserved through conveniences supplied by private corporations or individuals, has been too long recognized to be questioned. In such cases the property is not so much appropriated to the public use as taken to subserve some general and important public policy; and the difference between a forced sale for a reasonable compensation paid and a forced exaction without any pecuniary return, is amply sufficient to justify more liberal rules in the former case than in the latter." *Id.,* 339.

The language indicates that in 1877 the government was free to employ eminent domain more liberally than the taxing power. That, however, is more indicative of the restrictions upon the taxing power in the last half of the 19th Century than upon the breadth of eminent domain. Since then, however, as noted above, the taxing power has been significantly expanded. Moreover, the private corporations about which the *Ryerson* Court spoke were engaged in the establishment of instrumentalities of commerce. Such corporations, unlike General Motors in this case, fall within a firmly

---

ties of public transport and commerce such as canals, highways, and bridges, which may in effect permit private companies to exercise the power of eminent domain, are historical aberrations justified by "overriding public necessity". See generally Part IV, *infra.*

established and carefully defined exception to the general prohibition against the use of eminent domain for the specific benefit of private corporations.[17] Today, therefore, when dealing with eminent domain unrelated to development of the avenues of commerce, it is reasonable, indeed necessary, to conclude that, for purposes of aiding private corporations, eminent domain is more restrictive than the power of taxation. In fact, the *Ryerson* Court *struck down* a statute authorizing condemnation of property for construction of waterpower mills to be privately owned and operated, calling such action a taking for private use. *Cf. Board of Health of Portage Twp v Van Hoesen,* 87 Mich 533; 49 NW 894 (1891), in which a statute authorizing condemnation by privately controlled corporations to establish and maintain rural cemeteries was held unconstitutional as authorizing a taking for private use.

As a general proposition then, in the realm of aid to private corporations, "public purpose" (taxation) has been construed less restrictively than "public use" (eminent domain). The distinction is fully justified. The character of governmental interference with the individual in the case of taxation is wholly different from the case of eminent domain. The degree of compelled deprivation of property is manifestly less intrusive in the former case: it is one thing to disagree with the purposes for which one's tax money is spent; it is quite another to be compelled to give up one's land and be required, as in this case, to leave what may well be a lifelong home and community.

The distinction is further reflected in the Legislature's proper role, as we have defined it, in describing the ambits of the terms. As this Court

---

[17] See generally Part IV, *infra.*

has previously said: "[T]he determination of what constitutes a public purpose is primarily the responsibility of the Legislature". *Advisory Opinion, supra,* 696. " '[T]he determination of the legislative body of that matter should not be reversed except in instances where such determination is palpable and manifestly arbitrary and incorrect' ". *Gregory Marina, Inc v Detroit,* 378 Mich 364, 396; 144 NW2d 503 (1966) (plurality opinion) (quoting 37 Am Jur, Municipal Corporations, § 120). Other decisions of this Court abound with similar statements of deference to legislative determinations respecting the boundaries of "public purpose".

The eminent domain cases, on the other hand, evince no like commitment to minimal judicial review. Instead, it has always been the case that this Court has accorded little or no weight to legislative determinations of "public use". "Whether the use for which land is sought to be acquired by condemnation is a public one is a *judicial* question". (Emphasis added.) *General Development Corp v Detroit,* 322 Mich 495, 498; 33 NW2d 919 (1948); accord, *Lakehead Pipe Line Co v Dehn,* 340 Mich 25, 39-40; 64 NW2d 903 (1954); *Cleveland v Detroit,* 322 Mich 172, 179; 33 NW2d 747 (1948); *Board of Health of Portage Twp v Van Hoesen,* 87 Mich 533, 539; 49 NW 894 (1891).

Defendants have cited the following cases to support the argument for minimal judicial review in the instant case: *Gregory Marina, Inc v Detroit, supra; City of Gaylord v Gaylord City Clerk,* 378 Mich 273; 144 NW2d 460 (1966); *Hays v Kalamazoo,* 316 Mich 443; 25 NW2d 787; 169 ALR 1218 (1947), and the majority relies on *Gregory Marina, supra.* Notably, each of the cases deals with the power of taxation, not eminent domain.

The majority also relies on *Berman v Parker,* 348 US 26, 32; 75 S Ct 98; 99 L Ed 27 (1954), as did the *Gregory Marina* plurality, where the United States Supreme Court said, "The role of the judiciary in determining whether [the] power [of eminent domain] is being exercised for a public purpose is an extremely narrow one".

The Court's reliance on *Berman* is particularly disingenuous. The case stands for minimal judicial review of acts of *Congress* by *federal* courts with respect to application of the *Fifth Amendment* taking clause, which per se applies only to the federal government.

It is certainly true that the Fifth Amendment taking clause is incorporated in the Fourteenth Amendment due process clause and applies to the states. *E.g., Penn Central Transportation Co v New York City,* 438 US 104, 122; 98 S Ct 2646; 57 L Ed 2d 631 (1978). It is also true that in construing the Fourteenth Amendment the United States Supreme Court has adopted a deferential standard of review. See *Rindge Co v Los Angeles County,* 262 US 700, 705-706; 43 S Ct 689; 67 L Ed 1186 (1923). But deference is paid *not* to the decisions of state *legislatures* but to the judgments of state *courts* pertaining to the public use question in the context of state law. The distinction is critical and, in this case, makes the whole difference.

"The nature of a use, whether public or private, is ultimately a judicial question. However, the determination of this question is influenced by local conditions; and this Court, while enforcing the Fourteenth Amendment, should keep in view the diversity of such conditions and regard with great respect the judgments of state *courts* upon what should be deemed public uses in any State." *Rindge Co v Los Angeles County, supra,* 705-706 (emphasis added).

That the United States Supreme Court would defer to the decisions of Congress while interpreting the Fifth Amendment or to this Court while interpreting the Fourteenth Amendment on the issue of public use, is no logical support for the proposition that this Court, in construing the Michigan constitution, should defer to the judgment of the Michigan Legislature.

In point of fact, this Court has *never* employed the minimal standard of review in an eminent domain case which is adopted by the majority in this case. Notwithstanding explicit legislative findings, this Court has always made an *independent* determination of what constitutes a public use for which the power of eminent domain may be utilized.

The historic distinction notwithstanding, it is clear that the terms "public use" and "public purpose" have, indeed, been used interchangeably in the inexact language of both eminent domain and taxation cases written by this Court. See, *e.g.,* *In re Slum Clearance,* 331 Mich 714, 720; 50 NW2d 340 (1951) (eminent domain) ("[T]he public purpose of slum clearance is * * * the one *controlling* purpose of the condemnation".); *Hays v Kalamazoo,* 316 Mich 443, 453; 25 NW2d 787; 169 ALR 1218 (1947) (taxation) (" 'A public use changes with changing conditions of society' "). It is equally clear, however, and this is what matters, that the different principles informing those terms have not been interchanged. By today's unsound and improvident decision, the separate jurisprudences of two constitutional provisions have been merged into one as though it was always so.[18]

---

[18] The brevity with which the majority accomplishes this feat is amazing. My colleagues simply state:

"We are persuaded the terms ['public use' and 'public purpose']

IV

Eminent Domain and Private Corporations

As a general rule, when the object of eminent domain is to take land for ultimate conveyance to a private corporation to use as it sees fit, the state constitution will forbid it as a taking for private use.

"Land cannot be taken, under the exercise of the power of eminent domain, unless, after it is taken, it will be devoted to the use of the public, independent of the will of the corporation taking it." *Berrien Springs Water-Power Co v Berrien Circuit Judge,* 133 Mich 48, 53; 94 NW 379 (1903).

Accordingly, land may not be condemned for private corporations engaged in the business of water-power mills, *Ryerson v Brown,* 35 Mich 333 (1877); cemeteries, *Board of Health v Van Hoesen,* 87 Mich 533; 49 NW 894 (1891); or general retail, *Shizas v Detroit,* 333 Mich 44; 52 NW2d 589 (1952). In this case, land has been condemned · solely for a private corporation engaged in the business of manufacturing automobiles.

A

It is plain, of course, that condemnation of property for transfer to private corporations is not wholly proscribed. For many years, and probably since the date of Michigan's statehood, an exception to the general rule has been recognized. The exception, which for ease of reference might be denominated the instrumentality of commerce exception, has permitted condemnation for the estab-

have been used interchangeably in Michigan statutes and decisions in an effort to describe the protean concept of public benefit."

lishment or improvement of the avenues of commerce—highways, railroads, and canals, for example—and can be traced to the common law where it was considered an exception to a general rule:

"This right, it has been held, may be exercised on behalf of railways in the hands of private parties. But there can be no doubt, I think, that this holding was a considerable modification of common law principles." *People ex rel Detroit & Howell R Co v Salem Twp Board,* 20 Mich 452, 479 (1870).

The exception was delineated in the early case of *Swan v Williams,* 2 Mich 427, 439 (1852):

"The object of the Legislature, being to open and facilitate communications for the public, determines as we have seen, the character of this corporation. The power to delegate the exercise of the *eminent domain,* to effectuate such purpose, from the universality of its exercise, is no longer an open question. In every instance of turnpike, plank road, bridge, ferry, and canal companies, it has been employed, as well as those of railroads. All this class of incorporations have been enacted upon the hypothesis that the lands taken for these purposes were taken for public use, and not for private endowment."

Expressing the same rule of law, Justice CAMPBELL said:

"It is a principle which no respectable authority has ventured to deny, that property can never be condemned for private improvements, except where they belong to a class that cannot usually exist without the exercise of that power, and where the public welfare requires that they shall be encouraged. The improvements which unite both these conditions have been found in practice to be very few, and to be confined generally to some of the various kinds of roads or ways

by land or by water." *Ryerson v Brown, supra,* 343-344 (separate opinion).

See *Rindge Co v Los Angeles County,* 262 US 700, 706; 43 S Ct 689; 67 L Ed 1186 (1923), where the Court observed "That a taking of property for a highway is a taking for public use has been universally recognized, from time immemorial". This Court has never hesitated to permit the use of eminent domain by or for private corporations so long as the land condemned served thereafter as an instrumentality of commerce. See *Lakehead Pipe Line Co v Dehn,* 340 Mich 25; 64 NW2d 903 (1954) (oil pipeline); *Detroit International Bridge Co v American Seed Co,* 249 Mich 289; 228 NW 791 (1930) (highways and bridges); *Swan v Williams,* 2 Mich 427 (1852) (railroad); *cf. State Highway Comm v Vanderkloot,* 392 Mich 159; 220 NW2d 416 (1974) (condemnation for highway with government retaining ownership is permissible) (by implication).

It cannot for an instant be maintained, however, nor has anyone suggested, that the case before us falls within the instrumentality of commerce exception.

In fact, the only authorities that even arguably support or justify the use of eminent domain in this case are the "slum clearance" cases. *In re Slum Clearance,* 331 Mich 714; 50 NW2d 340 (1951); *General Development Corp v Detroit,* 322 Mich 495; 33 NW2d 919 (1948); *In re Jeffries Homes Housing Project,* 306 Mich 638; 11 NW2d 272 (1943); *In re Brewster Street Housing Site,* 291 Mich 313; 289 NW 493 (1939). These cases hold that slum clearance is a public use for which eminent domain may be employed. The distinction, however, between those cases and the one at hand is evident. The fact that the private

developers in the cited cases, to whom the city sold the cleared land, eventually benefitted from the projects does not lend validity to the condemnation under consideration here. Justice FITZGERALD, in his dissenting opinion, correctly stresses the observation of the *In re Slum Clearance* Court that in those cases the object of eminent domain was found, and the decision to exercise the power was made, entirely apart from considerations relating to private corporations.

> "It seems to us that the public purpose of slum clearance is in any event the one *controlling* purpose of the condemnation. The jury were not asked to decide any necessity to condemn the parcels involved for any purpose of resale, but only for slum clearance.
>
> \* \* \* .
>
> "In the instant case, the resale \* \* \* is not a primary purpose and is incidental and ancillary to the primary and real purpose of clearance. Reconstruction was asked for in the petition and resale is necessary for such purpose, but the resale is not for the purpose of enabling the city nor any private owner to make a profit.
>
> \* \* \*
>
> " 'It was not the purpose of this condemnation proceeding to acquire property for resale. It was to remove slums for reasons of the health, morals, safety and welfare of the whole community.' " *In re Slum Clearance, supra,* 720, 722 (emphasis in original).

Even if circumstances made redevelopment impossible, slum clearance would be justified on the ground that clearance *in and of itself* is a public use. That is, "[o]nce the area has been reclaimed and cleared, and is available for development, the public purpose has been fulfilled". *Ellis v Grand Rapids,* 257 F Supp 564, 571 (WD Mich, 1966). Simply put, the object of eminent domain when

used in connection with slum clearance is not to convey land to a private corporation as it is in this case, but to erase blight, danger and disease.

The inapplicability of the slum clearance cases is evident. In the case before us the reputed public "benefit" to be gained is inextricably bound to ownership, development and use of the property in question by one, and only one, private corporation, General Motors, and then only in *the* manner prescribed by the corporation. The public "benefit" claimed by defendant to result can be achieved only if condemnation is executed upon an area, within a timetable, essentially for a price, and entirely for a purpose determined not by any public entity, but by the board of directors of General Motors. There may never be a clearer case than this of condemning land for a private corporation.

## B

As discussed above, land may not be condemned for a private corporation save for those cases falling within what I have called the instrumentality of commerce exception. This has been the unwavering rule in this state for well over a century. It may be argued, however, that the fact that the case before us lies outside the exception does not end the inquiry if the reasons justifying the existing exception are present here. I turn now to determine whether such reasons exist.

Examination of the cases involving the instrumentality of commerce exception reveal that three common elements appear in those decisions that go far toward explicating and justifying the use of eminent domain for private corporations: 1) *public* necessity of the extreme sort, 2) continuing accountability to the *public,* and 3) selection of land

according to facts of independent *public* signifi-
cance.

1. *Public Necessity of the Extreme Sort Other-
wise Impracticable: The Indispensability of Collec-
tive Action*

To justify the exception, this Court has relied on
a principle expressed in varying phraseology such
as "overriding public necessity",[19] "necessity * * *
otherwise impracticable",[20] and "necessity of the
extreme sort".[21] The principle has to do not so
much with public benefit, which is to a greater or
lesser extent invariably present, as with the indis-
pensability of compelled expropriation of property
to the very *existence* of the enterprise pursued by
the private corporation. The principle, as valid
today as when stated years ago, is that "[e]very
branch of needful industry has a right to exist",
*People ex rel Detroit & Howell R Co, supra,* 482.
With regard to highways, railroads, canals, and
other instrumentalities of commerce, it takes little
imagination to recognize that without eminent
domain these essential improvements, all of which

---

[19] *People ex rel Detroit & Howell R Co, supra,* 480.

[20] *Id.,* 481.

[21] *Ryerson v Brown, supra,* 339.

This type of necessity, which goes to the legal question of public
use, should not be confused with "public necessity" as that term is
used in § 6 of the Michigan "quick-take" statute, which pertains to a
question of fact and provides, in pertinent part:

. "[T]he determination of public necessity by [a public] agency shall
be binding on the court in the absence of a showing of fraud, error of
law, or abuse of discretion." MCL 213.56(2); MSA 8.265(6)(2).

This question of fact is concerned with the need to condemn
particular land to achieve a given object. The minimal standard of
judicial review set out in the statute above is the usual one for
questions of fact.

But whether eminent domain may be employed at all to bring
about that object is an entirely distinct inquiry, a question of law for
the courts respecting the ambit of the constitutional term of art
"public use".

Hence, if an object is ruled not to be a public use, the factual
question of public necessity is obviated.

require particular configurations of property—narrow and generally straight ribbons of land—would be "otherwise impracticable"; they would not exist at all. "A railway cannot run around unreasonable landowners". *Ryerson v Brown, supra,* 339. *Cf. Ellis v Grand Rapids,* 257 F Supp 564, 568-569 (WD Mich, 1966) ("If each property owner within a chosen [urban renewal] area were allowed to successfully attack the plan as plaintiff attempts to do here, urban renewal would be stymied and *impossible* of accomplishment". [Emphasis added.]).

Thus, the exercise of eminent domain for private corporations has been limited to those enterprises generating public benefits whose very *existence* depends on the use of land that can be assembled only by the coordination central government alone is capable of achieving.

The production of automobiles certainly entails public benefits. Nevertheless, it could hardly be contended that the existence of the automotive industry or the construction of a new General Motors assembly plant requires the use of eminent domain.

Instead, what defendants are really claiming is that eminent domain is required for the existence of a new General Motors assembly plant within the city limits of Detroit *in order to comply with the specifications of General Motors.* This is an altogether different argument, acceptance of which would vitiate the requirement of "necessity of the extreme sort" and significantly alter the balance between governmental power and private property rights struck by the people and embodied in the taking clause. Just as ominously, it would work a fundamental shift in the relative force between private corporate power and individual property rights having the sanction of the state.

*2. Continuing Accountability to the Public: A Condition for the Use of Public Power*

Another circumstance common to the instrumentality of commerce cases justifying condemnation for private corporations is the retention of some measure of government control over the operation of the enterprise after it has passed into private hands. For example, railroad companies entitled to invoke eminent domain are subject to a panoply of regulations, see MCL 463.1 *et seq.;* MSA 22.201 *et seq.,* such as seeing to it that the public has equal and fair access to use of the railroad, see MCL 464.10; MSA 22.213. Furthermore, as was stated in *Swan v Williams,* 2 Mich 427, 439-440 (1852):

"The right to purchase and hold lands for the purposes of the road, being a right delegated in virtue of the eminent domain of the government, and derogatory to those of the citizen whose property is condemned, must be construed as conferring no right to hold the property in derogation of the purposes for which it was taken. By the terms of the charter the title to the lands is contingent upon their occupation as a railroad. It is vested in the company so long as they are used for a railroad, and no longer."

A fuller explication of the principle of public accountability was made in *Board of Health of Portage Twp v Van Hoesen,* 87 Mich 533, 539; 49 NW 894 (1891) (establishment of cemeteries by private corporation is not a public use):

"To justify the condemnation of lands for a private corporation, not only must the purpose be one in which the public has an interest, but *the state must have a voice in the manner in which the public may avail itself of that use.* In *Gilmer v [A Certain Tract of Land, Known as] "Lime Point",* 18 Cal 229 [1861], a public use

is defined to be a use which concerns the whole community, as distinguished from a particular individual. The use which the public is to have of such property must be fixed and definite. The general public must have a right to a certain definite use of the private property, on terms and for charges fixed by law, and the owner of the property must be compelled by law to permit the general public to enjoy it. It will not suffice that the general prosperity of the community is promoted by the taking of private property from the owner, and transferring its title and control to a corporation, to be used by such corporation as its private property, uncontrolled by law as to its use. In other words, *a use is private so long as the land is to remain under private ownership and control, and no right to its use, or to direct its management, is conferred upon the public."* (Emphasis added.)

Similarly, this Court disapproved condemnation that would have facilitated the generation of water power by a private corporation because the power company "will own, lease, use, and control" the water power. *Berrien Springs Water-Power Co v Berrien Circuit Judge,* 133 Mich 48, 51; 94 NW 379 (1903). In addition, the Court warned, "Land cannot be taken, under the exercise of the power of eminent domain, unless, after it is taken, it will be devoted to the *use* of the public, *independent of the will of the corporation taking it". Id.,* 53 (emphasis added). And in *Detroit International Bridge Co v American Seed Co,* 249 Mich 289, 296; 228 NW 791 (1930), the Court upheld a statute empowering private corporations organized to build highway bridges or tunnels to condemn land, but stressed that, although the statute did not expressly prohibit private uses of the land by the corporations, the obligation to preserve the public purpose was implied from acceptance of the right of eminent domain.

Whether or not one subscribes to the fiction that, in the instrumentality of commerce cases, the private corporation is merely a public agent, it is clear that public control of the use of land after transfer to the private entity invests the taking with far greater public attributes than would exist without the control and fortifies the justification for the abridgment of individual property rights in those cases.

One of the reasons advanced by the defendants as justification of the taking in this case, and adopted by the majority, is the claim of alleviation of unemployment. Even assuming, *arguendo,* that employment per se is a "necessity of the extreme sort", there are no guarantees from General Motors about employment levels at the new assembly plant. General Motors has made *representations* about the number of employees who will work at the new plant, and I certainly do not doubt the good faith of those representations. But the fact of the matter is that once CIP is sold to General Motors, there will be no public control whatsoever over the management, or operation, or conduct of the plant to be built there. General Motors will be accountable not to the public, but to its stockholders. Who knows what the automotive industry will look like in 20 years, or even 10? For that matter, who knows what cars will look like then? For all that can be known now, in light of present trends, the plant could be fully automated in 10 years. Amid these uncertainties, however, one thing is certain. The level of employment at the new GM plant will be determined by private corporate managers primarily with reference, not to the rate of regional unemployment, but to profit.

By permitting the condemnation in this case, this Court has allowed the use of the public power

of eminent domain without concomitant public accountability.

3. *Choosing the Land: Facts of Independent Public Significance*

The third element common to our cases has to do with the recognition that when property is condemned for a private corporation, determination of the specific land to be condemned is made without reference to the private interests of the corporation. The determination is based instead upon criteria related to the public interest.

In the case of instrumentalities of commerce, particular land is condemned because of the inherent nature of those instrumentalities, which normally demand narrow and generally straight parcels of land, and because of the location of population centers and natural conditions, such as rivers. These are facts of independent public significance. *Cf., e.g., In re Slum Clearance, supra* (condemnation of land for slum clearance determined by location of blight) (by implication).

Without belaboring the obvious, the location of CIP is, to say the least, solely a result of conditions laid down by General Motors, which were designed to further its private, pecuniary interest. These are facts of private significance.

The three elements discussed above are not recognized by the majority, which instead has tied the concept of public use to the existence of a public benefit. Yet, the principles inhering in the precedent demonstrate that, although public benefit is a necessary condition, it is itself an insufficient condition for the existence of a public use.

From now on "the protean concept of public benefit" will be the sole criterion by which we are to adjudge the constitutionality of employing eminent domain for private corporations. The concept

of public benefit is indeed protean. It is also nebulous. The state taking clause has now been placed on a spectrum that admits of no principles and therefore no limits.

## V

### CONCLUSION

The condemnation of land for CIP is not consistent with any of the three significant elements present in the instrumentality of commerce cases, which elements together justify, in a principled manner, the use of eminent domain for private corporations.

Consideration of the general prohibition against the taking of private property for private corporations with the principles justifying exception thereto reveals that a more general principle, consonant with prior decisions of this Court and entirely contrary to the holding of the majority here, is contained in the state taking clause: the right to own and occupy land will not be subordinated to private corporate interests unless the use of the land condemned by or for the corporation is invested with public attributes sufficient to fairly deem the corporate activity governmental. It is a principle consistently honored in the decisions of this Court, until now. In addition to its precedential weight, it reflects a common-sense balance struck in the Constitution for governance of the triangular relationship between government and two competing private parties. Now, however, that balance is fundamentally upset.

The majority opinion stands in contravention of the well-established and constant jurisprudence of the taking clause of the Michigan constitution. Present economic conditions notwithstanding, I

can discern no principled ground on which their decision can be reconciled with the body of law interpreting the state taking clause. Their decision would be less dangerous were there a sound basis for the change in the law, or even claim of one. However, since the arguments were directed toward justifying the condemnation in question on the basis of present law, understandably no reasons for a change in the law were offered.

I noted earlier that the concept of public purpose, which describes the bounds of the state's taxing power, has undergone significant expansion over the course of the last century. Compare *People ex rel Detroit & Howell R Co v Salem Twp Board, supra*, with *City of Gaylord v Gaylord City Clerk, supra*. Now it is common for the state to aid private corporations, directly or indirectly, through the use of public revenues. See, *e.g., Alan v Wayne County*, 388 Mich 210; 200 NW2d 628 (1972); *City of Gaylord v Gaylord City Clerk, supra*. The most conspicuous recent example is the $150 million loan to the Chrysler Corporation, see generally MCL 21.142 *et seq.;* MSA 3.690 *et seq.* (1980 PA 30). Chrysler, of course, also received federally guaranteed loans.

There are at least two compelling considerations that weigh decisively against the similar expansion of "public use" accomplished so precipitously by the majority.

First, as discussed earlier, the deprivations of property that result from the exercise of the powers of taxation and eminent domain are different in kind. Eminent domain is a far more intrusive power. Like taxation, it can entail financial loss, although "just compensation" is required. But more important, it can entail, as it did in this case, intangible losses, such as severance of personal

attachments to one's domicile and neighborhood and the destruction of an organic community of a most unique and irreplaceable character.

Second, when the private corporation to be aided by eminent domain is as large and influential as General Motors, the power of eminent domain, for all practical purposes, is in the hands of the private corporation. The municipality is merely the conduit. In contrast, the broader view of the notion of "public purpose" has not effected a comparable transfer of the power of taxation to the private sector. Government still determines how tax liability is computed and how and under what conditions tax revenues are spent.

Eminent domain is an attribute of sovereignty. When individual citizens are forced to suffer great social dislocation to permit private corporations to construct plants where they deem it most profitable, one is left to wonder who the sovereign is.

The sudden and fundamental change in established law effected by the Court in this case, entailing such a significant diminution of constitutional rights, cannot be justified as a function of judicial construction; the only proper vehicle for change of this dimension is a constitutional amendment. What has been done in this case can be explained by the overwhelming sense of inevitability that has attended this litigation from the beginning; a sense attributable to the combination and coincidence of the interests of a desperate city administration and a giant corporation willing and able to take advantage of the opportunity that presented itself. The justification for it, like the inevitability of it, has been made to seem more acceptable by the "team spirit" chorus of approval of the project which has been supplied by the voices of labor, business, industry, government,

finance, and even the news media. Virtually the only discordant sounds of dissent have come from the minuscule minority of citizens most profoundly affected by this case, the Poletown residents whose neighborhood has been destroyed.

With this case the Court has subordinated a constitutional right to private corporate interests. As demolition of existing structures on the future plant site goes forward, the best that can be hoped for, jurisprudentially, is that the precedential value of this case will be lost in the accumulating rubble.

I would hold MCL 125.1622; MSA 5.3520(22) unconstitutional because it authorizes a taking of property for private use both facially and as applied.