## MOORE v CITY OF DETROIT

Docket No. 76710. Submitted March 20, 1985, at Detroit.—Decided
  October 21, 1985.

In 1983, the Detroit City Council enacted Ordinance No. 556-H,
  known as the "homesteader's ordinance", as a part of the
  Detroit Municipal Code. The ordinance provides a mechanism
  by which private individuals may enter, inhabit and rehabili-
  tate abandoned single-family dwellings. A person wishing to do
  so makes application to the Department of Building Safety and
  Engineering and, after an investigation by that department,
  notice to interested parties, a hearing, and the filing of a
  satisfactory recommendation, enters into a contract which oper-
  ates as a temporary permit under the building code. The
  individual and the city both have certain rights and responsi-

REFERENCES FOR POINTS IN HEADNOTES

[1] Am Jur 2d, Mandamus §§ 94-103.
  See the annotations in the ALR3d/4th Quick Index under Manda-
  mus.

[2] Am Jur 2d, Mandamus §§ 39-45.

[3] Am Jur 2d, Constitutional Law §§ 294-302, 350, 351.

[3, 5] Am Jur 2d, Municipal Corporations, Counties, and Other Politi-
  cal Subdivisions §§ 28, 196, 197.
  See the annotations in the ALR3d/4th Quick Index under Munici-
  pal Corporations; Separation of Powers.

[4, 5] Am Jur 2d, Municipal Corporations, Counties, and Other Politi-
  cal Subdivisions §§ 126 et seq.
  Doctrine of de facto existence or powers of municipal corporation as
  applicable to amendment or revision of charter. 7 ALR2d 1407.

[5] Validity and construction of statute or ordinance providing for
  repair or destruction of residential building by public authorities
  at owner's expense. 43 ALR3d 916.

[6] Am Jur 2d, Municipal Corporations, Counties, and Other Political
  Subdivisions §§ 374-377.

[7] Am Jur 2d, Statutes §§ 356-359.
  Am Jur 2d, Municipal Corporations, Counties, and Other Political
  Subdivisions §§ 374-377.
  See the annotations in the ALR3d/4th Quick Index under Building
  Permit.

[8] Am Jur 2d, Parties §§ 172-175.
  See the annotations in the ALR3d/4th Quick Index under Interven-
  tion.

bilities in regard to the property. At about the time the ordinance was to become effective, Annie Moore, Johneece Lynn and others sought to apply for contracts on dwellings. They were informed that the city did not have such a program. Thereafter plaintiffs, Moore, Lynn, the Association of Community Organizations for Reform Now and Hubbard Farms Community Group, brought an action for mandamus against the City of Detroit and Creighton Lederer, as director of the Department of Building Safety and Engineering, to compel defendants to implement the ordinance. The Wayne Circuit Court, Michael J. Connor, J., granted mandamus, requiring defendants to take the necessary steps to implement the ordinance. The court also entered an order granting a motion to the Detroit City Council to intervene as plaintiffs and appointed special corporation counsel for the city council. The defendants appealed, alleging that mandamus is unavailable because the duties sought to be enforced were created by an invalid ordinance and are contrary to law. Defendants' challenge to the validity of the ordinance alleges that the ordinance violates the doctrine of separation of powers, conflicts with the Detroit City Charter, and is preempted by the State Construction Code Act and the Uniform Condemnation Procedures Act. *Held:*

1. This is an appropriate case for an action for mandamus. It is an action by real parties in interest to compel implementation of a duly enacted municipal ordinance by municipal officers. As a defense, the defendants may properly raise the question of the validity of the ordinance.

2. It is not necessary to decide whether the separation of powers clause of the Michigan Constitution applies to municipal governments because defendants also relied on the Detroit City Charter's provision for two separate branches of city government. Defendants alleged that the creation of programs to preserve and rehabilitate housing was vested exclusively in the city's executive branch; however, the language of the charter does not lead to such a conclusion. Creation of the rehabilitation program was a proper exercise of the city council's legislative powers. Further, the ordinance does not constitute a usurpation of executive prerogatives.

3. The ordinance does not conflict with various provisions of the city charter concerning contracting, tax liens, actions to quiet title, expenditures from general city revenues, and the duties and powers of the Department of Building Safety and Engineering.

4. The City of Detroit, as a home rule city, has exempted itself from the state construction code and has adopted its own

building code. Thus, the city may amend its code by ordinance. Further, the rehabilitation ordinance does not conflict directly with the provisions of the State Construction Code Act.

5. The ordinance does not involve the city's exercise of its powers of eminent domain, but, rather, deals with property once privately owned but subsequently abandoned. It does not conflict with, and is not preempted by, the Uniform Condemnation Procedures Act.

6. The trial court did not abuse its discretion in granting the city council's motion to intervene nor in appointing special corporation counsel to represent the city council.

Affirmed.

1. MANDAMUS — DEFENSES — LEGALITY OF LEGISLATION.

Public officials may defend against an action for mandamus by challenging the legality of the legislation, whether statute or ordinance, creating the duty to act.

2. MANDAMUS — CIRCUIT COURTS.

Mandamus relief is available at the discretion of a trial court once the plaintiff has established that the defendant had a clear legal duty to act and did not do so; the trial court also has the power to issue a writ compelling the exercise of the defendant's discretionary powers, although the court may not control the manner in which the defendant exercises that discretion.

3. CONSTITUTIONAL LAW — SEPARATION OF POWERS — MUNICIPAL CORPORATION.

It has not been expressly decided whether the constitutional separation of powers provision applies to municipal governments as well as to the state (Const 1963, art 3, § 2).

4. MUNICIPAL CORPORATIONS — HOME RULE CITIES — CHARTERS — ORDINANCES.

Conflicts between a provision of a home rule charter and an ordinance enacted under the charter are to be resolved in favor of the charter.

5. MUNICIPAL CORPORATIONS — DETROIT CITY CHARTER — HOUSING REGULATION.

The plain and unambiguous language of provisions of the Detroit City Charter does not indicate an intent by the framers of the charter either to divest the city council of the power to legislate over matters regarding vacant and abandoned housing or to vest authority for the implementation of all housing programs

in the Community and Economic Development Department to the exclusion of all other executive departments (Detroit Charter, art 7, ch 5, § 7-501).

6. MUNICIPAL CORPORATIONS — STATE LAW — PREEMPTION.

Municipal regulation in a specified area may be found to be preempted by state law where (1) state law expressly provides that the state's authority to regulate the area is exclusive, (2) preemption is implied from an examination of the history of state laws in that area, (3) the pervasiveness of the statutory regulatory scheme supports a finding of preemption, or (4) the nature of the subject matter demands exclusive state regulation to achieve the uniformity necessary to serve the state's purpose.

7. MUNICIPAL CORPORATIONS — STATE CONSTRUCTION CODE — BUILDING CODES.

The state construction code is applicable to all governmental subdivisions of the state unless a subdivision exempts itself by adopting and enforcing another nationally recognized building code; a municipality which has done so may thereby amend by ordinance the code which is applied within its boundaries (MCL 125.1501 *et seq.;* MSA 5.2949[1] *et seq.).*

8. TRIAL — PARTIES — INTERVENING PARTIES.

The decision to allow intervention of third parties in a lawsuit is discretionary with the trial court; in deciding a motion to intervene the court must consider, among other factors, whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties (GCR 1963, 209).

*Emily C. Hall* and *Richard A. Soble,* for plaintiffs.

*Donald Pailen,* Corporation Counsel, *Abigail Elias,* Deputy Corporation Counsel, and *Joseph N. Baltimore* and *Patricia Irving-Cwiek,* Assistants Corporation Counsel, for defendant.

*Colista & Urso* (by *F. Philip Colista* and *Constance J. Allen),* for the Detroit City Council.

Before: BEASLEY, P.J., and M. J. KELLY and M. WARSHAWSKY,* JJ.

M. J. KELLY, J. Defendants appeal as of right from an order of mandamus directing the City of Detroit and Creighton Lederer, in his capacity as director of the Department of Building Safety and Engineering for the City of Detroit, to implement Ordinance No. 556-H, enacted by the Detroit City Council on July 27, 1983, and entitled the Nuisance Abatement Ordinance. Following a review of the trial court record and briefs on appeal as well as applicable statutory, municipal and appellate case law, we affirm.

I

INTRODUCTION

This case concerns the validity of an ordinance enacted by the Detroit City Council in July of 1983. Referred to by the media as "the homesteader's ordinance", Ord. 556-H was enacted as an amendment to the Detroit Building Code, at that time codified in Chapter 12 of the Detroit Municipal Code, now Chapter 9 of the Detroit City Code. Ord. 556-H creates a mechanism or procedure whereby private individuals are authorized by the city to enter, inhabit and rehabilitate abandoned homes prior to the city's formal acquisition of title. All parties agree that the ordinance represents an innovative attempt to arrest the spread of urban blight caused by the abandonment of single-family homes and thus has significant impact on municipal planning.

Ord. 556-H is lengthy and detailed. A complete synopsis here is not undertaken but a general

---

* Circuit judge, sitting on the Court of Appeals by assignment.

outline is necessary to an understanding of the issues involved. By its express terms, the ordinance is limited in application to abandoned single-family dwellings. Abandoned dwellings are those which are "vacant, dilapidated and open at the door or window, leaving the interior of the building exposed to the elements or accessible to entrance by trespassers", and on which there are outstanding and unpaid state, county or municipal property taxes. Ord. 556-H, 12-11-46.2(a). The dwelling must also be a nuisance, which means a dangerous building as defined in the city's building code, Detroit Ordinances, 12-11-28.2.

Pursuant to Ord. 556-H, a private individual may, upon identifying a single-family dwelling which is believed to be an abandoned nuisance, file an application with the Department of Building Safety and Engineering for a "nuisance abatement contract", the purpose of which is to correct the conditions resulting in the nuisance. Upon receipt of the application, the department must inspect the dwelling and determine whether it is capable of being rehabilitated and whether it qualifies as an abandoned nuisance as defined in the ordinance. If so, the department must determine the assessed or current market value of the property, identify those repairs required to bring the building up to code and evaluate the cost of doing so. A notice of the department's findings is sent to both the owner of record and the nuisance abatement applicant. Ord. 556-H, 12-11-46.3(b)-(e).

If the dwelling qualifies for the nuisance abatement program, the department has 30 days to conduct a hearing before a departmental hearing officer. An order to show cause must be issued to the property owner of record and testimony must be presented at the hearing by the building inspector and city appraiser. Following the hearing, the

officer enters his or her findings and recommendation for disposition of the property, with copies to the owner and applicant. If a nuisance abatement contract is recommended, the owner has 20 days to respond. At the expiration of the 20 days, the hearing officer files a copy of his or her findings and recommendation with the city council. Within 30 days after receipt of the hearing officer's recommendation, city council must conduct a hearing, upon notice to the owner and to the applicant, at which it approves, disapproves or modifies the officer's recommendation. If the city council determines that the dwelling should either be demolished or rehabilitated under a nuisance abatement contract, notice of the decision is served on the owner who is provided a specified period of time within which to respond. The city must then wait 20 days before entering into the contract with the nuisance abatement applicant. Ord. 556-H, 12-11-46.3(f)-(j).

A properly executed nuisance abatement contract is treated as a temporary permit under the building code and operates as a stay of all taxes due on the property for the duration of the 36-month contract period. The contract must specify the necessary repairs, estimate the reasonable value of labor, materials and services and provide for the periodic inspection of the dwelling by the department. The value of the repairs becomes a lien on the property which must be satisfied as part of the owner's redemption costs. Ord. 556-H, 12-11-46.5. The ordinance also requires the city, whenever practicable, to institute actions to quiet title on property subject to a nuisance abatement contract for the purpose of passing title to the abatement contractor. Ord. 556-H, 12-11-46.6.

Ord. 556-H was to become effective on September 2, 1983. In August and in October of that year,

Annie Moore, Johneece Lynn and Jeryl Davis appeared at the Department of Building Safety and Engineering and sought to apply for nuisance abatement contracts on dwellings which they identified as appropriate for the program. On both occasions plaintiffs were informed that the city did not have such a program and their applications were refused. On November 1, 1983, Moore, Lynn, the Association of Community Organizations for Reform Now (ACORN) and Hubbard Farms Community Group filed this complaint for mandamus in an effort to compel implementation of Ord. 556-H. Simultaneous to the filing of the complaint, plaintiffs sought and obtained an order for defendants to show cause why a writ should not issue and a hearing was scheduled for December 9, 1983.

On November 23, 1983, defendants filed their answer and a motion for accelerated and/or summary judgment under GCR 1963, 116.1(2) and 117.2(1). Defendants alleged that plaintiffs had failed to state a claim for which relief could be granted and that the trial court lacked subject matter jurisdiction on the ground that Ord. 556-H was invalid under the laws of this state.

At the hearing conducted on December 9, 1983, the trial court denied defendants' motion for dismissal and delayed ruling on the request for mandamus upon being informed by counsel that defendants and city council were close to settling on compromise amendments to the ordinance. On January 18, 1984, however, council unanimously passed a resolution stating that it had not considered and was not then considering any amendments to Ord. 556-H.

Following various hearings and interim orders, the trial court on May 16, 1984, entered a final judgment and order awarding mandamus as follows:

"IT IS HEREBY ORDERED that Mandamus shall issue to require Defendants take all necessary measures to immediately implement the Nuisance Abatement Ordinance, duly enacted by the Detroit City Council on July 27, 1983;

"That Defendants immediately promulgate the necessary rules in accordance with the Detroit City Charter;

"That this Court's Order of February 1, 1984, attached hereto, is hereby incorporated as part of this Order;

"It is further ordered, for those reasons also indicated by the court on the record, that implementation of said ordinance shall be and same is hereby stayed pursuant to GCR 1963, 530.5 and during the pendency of an appeal to the Court of Appeals from this final order."

The court's order of February 1, 1984, had specifically ordered defendant Lederer to accept application forms from nuisance abatement applicants and to inspect the identified properties pursuant to § 46.3(c) of Ord. 556-H.

On May 24, 1984, the trial court signed and entered an order granting city councils' motion to intervene and appointed special corporation counsel for the city council.

## II

### MANDAMUS

Defendants preliminarily argue on appeal, as they did below, that a writ of mandamus is unavailable to plaintiffs because the duties sought to be enforced are created by an invalid ordinance and are therefore contrary to law. Plaintiffs respond that defendants' attack on the validity of the ordinance is not a proper defense in a mandamus action and that if defendants wish to challenge the legality of the ordinance, the appropriate procedural course for them is to commence an

action for declaratory judgment. Plaintiffs further argue that as long as the ordinance was enacted in good faith and is regular on its face and there is no pending petition for declaratory relief, the duty of the judiciary is to order defendants to implement its provisions.

Our review of the applicable case law persuades us that in Michigan, public officials may defend against a mandamus action by challenging the legality of the legislation creating the duty to act. There is no doubt that plaintiffs in a mandamus action may raise the constitutionality of a statute or ordinance. *Giddings v Secretary of State,* 93 Mich 1; 52 NW 944 (1892); *Hertel v Racing Commissioners,* 68 Mich App 191, 197-198; 242 NW2d 526 (1976), and *Deneweth v State Treasurer,* 32 Mich App 439, 442; 189 NW2d 10 (1971), *modified* 385 Mich 762 (1971). We infer from the Supreme Court's decision in *Bankhead v Mayor of River Rouge,* 387 Mich 610; 198 NW2d 414 (1972), that the legality of ordinances and statutes may also be raised by mandamus defendants. In *Bankhead,* plaintiff sought mandamus to compel the city to establish a board of tenant affairs, as required under 1968 PA 344, amending MCL 125.651 *et seq.;* MSA 5.3011 *et seq.* The city defended on the ground that 1968 PA 344 violated the title-object clause of the Michigan Constitution. Const 1963, art 4, § 24. On appeal, the Supreme Court considered the merits of this defense.

Given the Supreme Court's treatment of the defense position in *Bankhead,* we will consider in this case defendants' challenge to the legality of the law sought to be enforced, though with one exception. We do not decide whether Ord. 556-H is invalid because it unconstitutionally deprives property owners of their property interests without due process of law. In *Laubach v O'Meara,* 107 Mich

29, 31; 64 NW 865 (1895), the Supreme Court cited with approval the following passage from *Smyth v Titcomb,* 31 Me 272, 285-287 (1850):

"It does not, however, lie with the respondent, as a ministerial officer, to make this objection. He is not authorized, or required to adjudicate the law. On a summary hearing on a petition for a *mandamus,* this court will not determine the question of the constitutionality of the law, involving the rights of third persons, but will leave that question to be settled, when properly presented by parties to an action.

"* * * A public officer entrusted with the collection and disbursement of revenue, * * * has no right to refuse to perform his ministerial duties, prescribed by law, because he may apprehend that others may be injuriously affected by it * * *. He is not responsible for the law, or for the possible wrongs which may result from its execution. * * * Public policy, as well as public necessity and justice, require prompt and efficient action from such officers. * * *

"The consequences would be ruinous if they could withhold their services, and the necessary means, either from timidity, or captiousness, until all questions of law, which might arise in the performance of their official duties, should first be judicially settled."

Because defendants' Fifth Amendment challenge is one that should be asserted by third-party property owners, we leave that issue for resolution in an action between proper parties.

In all other respects, this is an appropriate case in which to entertain mandamus. It is an action by real parties in interest to compel implementation of a duly enacted municipal ordinance by municipal officers who, for political reasons, have been instructed by their executive not to do so. Once plaintiffs established below that defendants had a clear legal duty to act, mandamus relief was available at the discretion of the trial court. *Goode v Dep't of Social Services,* 143 Mich App 756; 373

NW2d 210 (1985). It was also within the power of the trial court to issue a writ compelling the exercise of defendants' discretionary powers, though the trial court may not control the manner in which the defendants exercise that discretion. *Teasel v Dep't of Mental Health,* 419 Mich 390, 410; 355 NW2d 75 (1984).

We turn now to the merits of defendants' substantive challenges to Ord. No. 556-H. Defendants argue (1) that the ordinance is violative of the doctrine of separation of powers, (2) that the ordinance conflicts with the Detroit City Charter and is therefore void, (3) that the ordinance conflicts with and is preempted by the State Construction Code Act of 1972, MCL 125.1501 *et seq.;* MSA 5.2949(1) *et seq.,* and (4) that the ordinance is preempted by the Uniform Condemnation Procedures Act, MCL 213.51 *et seq.;* MSA 8.265(1) *et seq.*

## III

### DOES ORDINANCE NO. 556-H VIOLATE THE SEPARATION OF POWERS DOCTRINE AS PROVIDED UNDER THE DETROIT CITY CHARTER?

Defendants contend that Ord. 556-H legislatively interferes with powers exclusively vested in the city's executive office. In support of their position, defendants rely in part upon Article 3, § 2 of the Michigan Constitution, which provides:

"The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."

Whether this separation of powers clause of the

Michigan Constitution applies only to the state and not to municipal governments is a question that the Michigan Supreme Court has expressly declined to decide. *Detroit Osteopathic Hospital v City of Southfield,* 377 Mich 128, 136-137; 139 NW2d 728 (1966). Since defendants also rely, and correctly so, on the Detroit City Charter in arguing that the city is governed by separate branches of authority, we decline to consider the constitutional question left open in *Detroit Osteopathic Hospital v City of Southfield* in deference to the general rule favoring decisions on nonconstitutional grounds. *People v Gauntlett,* 134 Mich App 737, 747; 352 NW2d 310 (1984), *modified* 419 Mich 909 (1984).

Articles 4 and 5 of the Detroit City Charter provide for two separate and distinct branches of city government. The legislative branch is comprised of the City Council, Detroit Charter, art 4, ch 1, § 101, and the executive branch is headed by an elected mayor, art 5, ch 1, § 101. Except as otherwise provided by law, the executive branch is vested with exclusive authority in "the implementation of programs, services and activities of city government". Detroit Charter, art 5, ch 1, § 102.

Defendants' main contention is that the creation and implementation of programs designed to preserve and rehabilitate city housing and prevent urban blight has been exclusively vested in the city's executive branch. Defendants point to art 7, ch 5, § 7-501 of the Detroit City Charter, which creates within the executive branch an agency referrred to as the Community and Economic Development Department (CEDD):

"A department or departments for community and economic development shall:
"1. Propose, administer, and carry out authorized

projects and programs for the conservation of stable areas, and for the elimination of blight and the restoration of decent, safe and sanitary living conditions in defined areas:

"2. Propose, administer, and carry out authorized projects, programs and plans of action intended to stimulate or aid the development of housing;

"3. Act as the 'local public agency' for purposes of federally aided urban renewal and similar projects. However, the housing commission or other body which includes at least as many residents of urban renewal areas as the housing commission shall participate in the planning of the consent to any such urban renewal project;

"4. Be responsible for seeking assistance for the city and business interests in the city, expecially small and minority business interests, under federal and other aid programs; and

"5. Endeavor to eliminate conditions of unemployment and under-employment and to maintain and strengthen the economy of the city by attracting new, and assisting the expansion of existing, commerce and industry in the city."

According to the defendants, programs such as the nuisance abatement contract created by Ord. 556-H are within the sole purview of the executive branch, specifically the CEDD, and the city council's usurpation of this function through its enactment of Ord. 556-H violates the charter. Since any conflicts between a home rule charter provision and an ordinance enacted under the charter are resolved in favor of the charter, *Thiesen v Dearborn City Council,* 320 Mich 446; 31 NW2d 806 (1948); *Michigan Law Enforcement Union, Teamsters Local 129 v Highland Park,* 138 Mich App 342, 347; 360 NW2d 611 (1984), defendants reason that Ord. 556-H is invalid and therefore void and unenforceable.

Our reading of the plain and unambiguous lan-

guage of the Detroit City Charter, *cf. Detroit Fire Fighters Ass'n v Detroit,* 127 Mich App 673, 677; 339 NW2d 230 (1983), does not convince us that its framers intended either to (1) divest city council of the power to legislate over matters regarding vacant and abandoned housing or (2) vest authority for the implementation of all housing programs in the CEDD to the exclusion of all other executive departments. Rather, we interpret the plain language of § 5-102 as exclusively reserving for the executive branch only the power of implementing or administering programs created under some other authority. Moreover, while it true that the CEDD has, under the charter, implementation authority in a specialized area, its authority is not exclusive of any other executive department.

Detroit is a home rule city and its city council has the power to enact ordinances to provide for the public peace and health of its citizenry and promote the safety of persons and properties within its boundaries. *Cady v Detroit,* 289 Mich 499, 514; 286 NW 805 (1939), *app dis* 309 US 620; 60 S Ct 470; 84 L Ed 984 (1940); *Butcher v Detroit,* 131 Mich App 698, 703; 347 NW2d 702 (1984), *lv den* 419 Mich 917 (1984). A program which is designed to assist private citizens in the rehabilitation of vacant and abandoned single-family dwellings falls within the legislative powers of the city council. Ord. 556-H was properly enacted as an amendment to the city's established building code which already provided for the disposition by demolition of vacant and abandoned homes under the auspices of the Building Safety and Engineering Department. As much as possible, Ord. 556-H "plugs into" existing mechanisms. It creates an alternative to demolition by encouraging rehabilitation prior to vandalization of a home beyond repair. We conclude that the creation of a program

designed to facilitate rehabilitation of abandoned housing in the City of Detroit is a proper exercise of the city council's legislative powers.

Ord. 556-H assigns primary responsibility for implementation of the nuisance abatement program to the Detroit Building Safety and Engineering Department, within the executive branch. We are not persuaded that the charter vests exclusive authority over housing programs in the CEDD. First, the charter provision creating CEDD does not expressly state that its authority to implement housing programs is exclusive. Second, other charter provisions vest the Building Safety and Engineering Department with the authority to administer and enforce laws and ordinances relating to the development, maintenance and use of real property. Detroit Charter, art 7, ch 4, §§ 7-401 and 7-404. We conclude that the Deparment of Building Safety and Engineering is an appropriate department within the executive branch of the City of Detroit to implement Ord. 556-H.

Defendants also argue that Ord. 556-H constitutes legislative interference with the exclusive power of the executive to direct and supervise employees of the executive branch. Detroit Charter, art 4, ch 1, § 4-112. We, however, are not persuaded that the ordinance is merely a loosely knit series of orders to various departmental employees of the executive branch. The ordinance is detailed and fairly specific in its description of the program to be implemented. We find this degree of specificity and detail analogous to provisions in the general building code providing for the demolition of vacant and abandoned buildings. For example, the building code directs that the department "shall examine every building or structure reported as dangerous, unsafe structurally or constituting a fire hazard" and where the complaint is

borne out by the inspection, the department "shall issue a notice * * * to the owner or owners of record to appear at a hearing before a Hearing Officer * * * and show cause why the building or structure should not be demolished, repaired or otherwise made safe". Detroit Municipal Code, art 11, ch 12, §§ 28.3 and 28.4. The fact that a municipal ordinance directs an executive department to carry out specific mandates does not constitute a usurpation of executive prerogatives.

## IV

### Is Ordinance No. 556-H Void Because it Conflicts With Various Provisions of the Detroit City Charter?

Defendants contend that even if Ord. 556-H does not constitute an illegal usurpation of executive power by the legislative branch, it nevertheless conflicts with no less than eight provisions of the Detroit City Charter defining the authority of various administrative departments. We consider defendants' arguments *seriatim.*

Detroit Charter, art 6, ch 3, § 6-306 requires that the city procure all property and services of independent contractors by the process of competitive bidding through the Office of the Purchasing Director. Defendants argue that § 6-306 is violated by Ord. 556-H which allows the city to enter into nuisance abatement contracts with independent contractors in circumvention of the competitive bidding process and without authority of the Office of the Purchasing Director. Defendants' position is premised on the belief that the procurement authority of the purchasing director is exclusive of all other departments. However, § 6-306.1 expressly states that "[a]n agency may be authorized by ordinance to procure specified kinds of property

and services directly". Ord. 556-H properly allows the Building Safety and Engineering Department to enter into nuisance abatement contracts, with the approval of the city council, but without competitive bidding or purchasing director involvement.

Ord. 556-H, § 12-11-46.3(k) provides that the costs incurred in performing a nuisance abatement contract shall be reported to the Board of Assessors to be assessed as a lien against the property and enforced as are all other special assessment liens or tax liens. We find no conflict between this provision and § 6-304 of the Detroit Charter which directs the Board of Assessors to implement its powers as provided by charter or ordinance.

While it is true, as defendants contend, that § 6-403 of the Detroit City Charter empowers corporation counsel to defend against certain actions "when directed to do so by the mayor", § 6-409 of the Detroit Charter additionally provides that "corporation counsel has such other duties as may be provided by * * * ordinance". Thus, the provision of Ord. 556-H which requires corporation counsel to institute actions to quiet title upon being advised to do so by city council and the Department of Building Safety and Engineering does not conflict with the city charter and is analogous to the provision in the general building code which directs the city's legal department to institute actions against owners of property for recovery of emergency repair costs. Detroit Municipal Code, § 12-11-29.5.

Contrary to defendants' arguments on appeal, Ord. 556-H, § 12-11-46.5 through 46.7 does not allow nuisance abatement contractors to recover the value of their repairs and services from general city revenues and does not, therefore, conflict with § 8-302 of the Detroit Charter. As pointed out

by plaintiffs' counsel at oral argument, the individual nuisance abatement contractor is required to independently finance the rehabilitation of the abandoned home with personal assets, loans from financial institutions, or through some other governmental program for which the contractor may qualify. The value of materials used and labor spent in the rehabilitation process is enforced as a lien against the property and is recovered by the nuisance abatement contractor from the city only if the owner redeems the property, in which case monies paid to the contractor are recovered by the city from the owner of record over and above any amounts to which the city is otherwise entitled. Ord. 556-H, § 12-11-46.5(g)(2). If the applicant purchases the property after the city quiets title, the contractor is paid for labor and materials in the form of a credit on the sale price of the property. Ord. 556-H, 12-11-46.5(g)(1). Moreover, since Ord. 556-H does not require title to be transferred to the nuisance abatement contractor until after the city has obtained title, we find no conflict between the ordinance and § 8-403 of the Detroit Charter.

Finally, defendants allege that Ord. 556-H violates the charter provisions which specify the duties and powers of the Building Safety and Engineering Department. However, the department is generally entrusted with the administration and enforcement of all ordinances regulating the maintenance and use of real property within the city and there is no conflict between the department's general authority under the charter and Ord. 556-H.

We find no merit in defendants' position that Ord. 556-H is invalid because it violates the Detroit City Charter.

V

Is Ordinance No. 556-H Preempted by the State
Construction Code Act of 1972 or by the
Uniform Condemnation Procedures Act?

Defendants next argue that Ord. 556-H is
preempted by two statutory schemes regulating
housing and private property. We disagree.

It is not disputed that the broad police powers of
a home rule city such as Detroit are limited by the
constitution and the laws of the state. Const 1963,
art 7 § 22; *People v Llewellyn,* 401 Mich 314, 322;
257 NW2d 902 (1977), *cert den* 435 US 1008; 98 S
Ct 1879; 56 L Ed 2d 390 (1978). This Court has
aptly summarized the doctrine of state law
preemption as follows:

"First, where state law expressly provides that the
state's authority to regulate in a specified area is to be
exclusive, there can be no doubt that municipal regula-
tion is pre-empted. Second, pre-emption of a field of
regulation may be implied from an examination of the
history of state laws in that field. Third, the pervasive-
ness of the statutory regulatory scheme may support a
finding of pre-emption. Finally, the nature of the regu-
lated subject matter may demand exclusive state regu-
lation to achieve the uniformity necessary to serve the
state's purpose." *Granger Land Development Co v Clin-
ton County Board of Zoning Appeals,* 135 Mich App
154, 157; 351 NW2d 908 (1984).

It is defendants' position that Ord. 556-H directly
conflicts with the State Construction Code Act of
1972, MCL 125.1501 *et seq.;* MSA 5.2949(1) *et seq.,*
and with the Uniform Condemnation Procedures
Act, MCL 213.51 *et seq.;* MSA 8.265(1) *et seq.* We
disagree.

A

The State Construction Code Act of 1972, MCL

125.1501 *et seq.;* MSA 5.2949(1) *et seq.,* directs a duly formed state commission to adopt a nationally recognized building code which shall govern the construction and occupation of buildings and structures throughout the state. MCL 125.1504(1), (2); MSA 5.2949(4)(1), (2). The term construction as used throughout the code includes reconstruction, alterations, and repairs. MCL 125.1502(1)(l); MSA 5.2949(2)(1)(l). The state construction code is applicable to all governmental subdivisions of this state unless a subdivision exempts itself by adopting and enforcing another nationally recognized building code or model building code. The City of Detroit has by ordinance exempted itself from the state construction code and has adopted for its use the International Basic Building Code of the Building Officials and Code Administrators, Inc., previously codified in Chapter 12 of the Detroit Municipal Code and now codified in Chapter 9 of the Detroit City Code.

The State Construction Code Act expressly provides that:

"A governmental subdivision which elects not to be governed by certain parts of this act and the code shall review and update its codes by amending its ordinance at least once every 3 years by adopting without amendment all changes to those codes and submitting a certified copy of the amended ordinance to the commission. However, a governmental subdivision adopting nationally recognized model codes may approve amendments to those codes by ordinance. The amendments shall become effective 90 days after passage of the ordinance and 90 days after a certified copy of the ordinance is delivered to the commission, unless the commission determines after a public hearing that the codes, as amended, do not adequately protect the health, safety, or welfare of the people of the governmental subdivision, or that the amendments tend to unnecessarily increase construction costs or restrict the

use of new materials, products, or methods of construction or provide preferential treatment to types or classes of materials, products, or methods of construction, or that the amendment obstructs the substantive uniformity of building codes within a region or locality in the state." MCL 125.1508(1); MSA 5.2949(8)(1).

Thus, by enacting an ordinance exempting itself from the state construction code and by adopting its own building code, the City of Detroit has ensured its ability to amend by ordinance the code applied within its boundaries. See *Ypsilanti Twp v Edward Rose Building Co,* 112 Mich App 64, 70-71; 315 NW2d 196 (1981). The city council of the City of Detroit expressly enacted Ord. 556-H as an amendment to the Detroit City Building Code.

With this background, we now consider whether Ord. 556-H directly conflicts with the state construction code. Defendants first argue that the ordinance allows nuisance abatement contractors to engage in the construction of buildings which they do not own without first obtaining a building permit, contrary to MCL 125.1510; MSA 5.2949(10), which provides in relevant part:

"Except as otherwise provide in the code, before construction of a building or structure, the owner, or the owner's builder, architect, engineer, or agent, shall submit an application in writing to the appropriate enforcing agency for a building permit."

We agree that Ord. 556-H creates an exception to the ownership and permit requirements of MCL 125.1510; MSA 5.2949(10), but we conclude that the City of Detroit is empowered to create such an exception and that the particular exception created here is not inconsistent with the general purpose of the code.

Ord. 556-H specifically provides that the nui-

sance abatement contract shall constitute a building permit as well as a temporary occupancy permit under the city's building code. Moreover, the nuisance abatement contract is not issued until the Department of Building Safety and Engineering has inspected the subject property, assessed its value and identified and estimated the cost of the repairs necessary to make the premises habitable. The nuisance abatement contract specified the particular repairs to be performed, as determined by the department, and provides for periodic inspection. Title to the property is not transferred to the nuisance abatement contractor until the department has determined that all of the necessary repairs have been completed. In short, the nuisance abatement contract is performed at the direction and under the close supervision of the Department of Building Safety and Engineering and satisfies the same general purposes served by the issuance of construction permits, that is, uniformity and quality control in construction throughout a particular locality.

Defendants' second argument is that Ord. 556-H conflicts with MCL 125.1515; MSA 5.2949(15) in that it allows for variances from the building code without benefit of public hearings. As noted, Ord. 556-H is an amendment to the building code. The issuance of a nuisance abatement contract is thus authorized by the building code itself, as amended, and does not constitute "a specific variance to a substantive requirement of the code". No public hearing is required.

Finally, since Ord. 556-H does not conflict with the State Construction Code Act, defendants will not be subject to the penalties prescribed under § 23 of the act. MCL 125.1523; MSA 5.2949(23).

B

Defendants also argue that Ord. 556-H is

preempted by the Uniform Condemnation Procedures Act, MCL 213.51 *et seq.;* MSA 8.265(1) *et seq.* We disagree. The Uniform Condemnation Procedures Act governs the acquisition of private property by government under its power of eminent domain. See preamble to 1980 PA 87, MCL 213.51 *et seq.;* MSA 8.265(1) *et seq.,* and MCL 213.52(2); MSA 8.265(2)(2). The act applies to the taking of private property for public use and requires payment of just compensation to the owner. Const 1963, art 10, § 2; *Poletown Neighborhood Council v Detroit,* 410 Mich 616, 629; 304 NW2d 455 (1981). In our view, Ord. 556-H does not apply to situations in which the City of Detroit attempts to confiscate privately owned property for public use. Rather, Ord. 556-H is limited to the city's attempts to dispose of property once privately owned but subsequently abandoned.

We find the provisions of the ordinance authorizing the city to obtain title to properties improved through the nuisance abatement program consistent with this distinction. Where practicable, the city is directed under Ord. 556-H to commence an action to quiet title pursuant to MCL 600.2932; MSA 27A.2932 or to commence delinquent tax proceedings pursuant to MCL 211.47; MSA 7.91. Both proceedings are authorized under state law, as is an action for condemnation. However, neither the quiet title action nor the delinquent tax sale involve the city's exercise of its power of eminent domain. We find no conflict between the Uniform Condemnation Procedures Act and the provisions of Ord. 556-H authorizing the city to institute an action for quiet title or commence delinquent tax sale proceedings on nuisance abatement property.

In sum, we conclude that Ord. 556-H is not preempted by either the State Construction Code

Act of 1972 or the Uniform Condemnation Procedures Act. The trial court did not err in issuing a writ of mandamus in this case.

## VI

### INTERVENTION OF CITY COUNCIL AND APPOINTMENT OF SPECIAL COUNSEL

Defendants' final challenge is to the trial court's order granting the city council's motion to intervene. Defendants argue that the motion should have been denied because it was untimely and because council has failed to demonstrate that its interest in the case is any different than that of the individual plaintiffs. GCR 1963, 209 governs the intervention of third parties in a lawsuit and provides that the decision to allow intervention is discretionary with the trial court. We find no abuse of the trial court's discretion in this case.

In deciding a motion to intervene, the trial court must consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties". GCR 1963, 209.2. Other relevant factors to consider are set forth in *D'Agostini v Roseville,* 396 Mich 185, 188-189; 240 NW2d 252 (1976). In this case, intervening plaintiff established that its interest in the mandamus action may not be adequately represented by the individual plaintiffs since city council is concerned with the implementation of all provisions of Ord. 556-H, including those that protect the record property owner and the city. We also find city council's intervention in this action justified by corporation counsel's erroneous representations in court prior to the intervention, alleging that council and the mayor were close to resolving their differences with amendments to the ordinance. Finally, we find no undue delay in the filing of the

motion to intervene since city council moved to intervene as soon as it appeared that the litigation would be prolonged and within several months of commencement of the suit. The trial court did not abuse its discretion in granting city council's motion to intervene in this action.

Nor do we find that the trial court erred in appointing special corporation counsel to represent the city council once it was allowed to intervene in this proceeding. Art 6, ch 4, § 6-408 of the Detroit City Charter provides:

"Upon the request of any agency or officer, the corporation counsel may employ an outside attorney as special corporation counsel for any particular matter or proceedings."

Pursuant to this charter provision, city council passed a resolution requesting corporation counsel to appoint special counsel to represent city council in this lawsuit. Corporation counsel refused the request.

While it is true that the term "may" as used in § 6-408 implies that an appointment under this charter provision is discretionary with corporation counsel, any exercise of that discretion must be in accordance with general principles of Michigan law. In this case, corporation counsel has taken a position on the legality of Ord. 556-H which directly conflicts with the position taken by city council. It is clear that corporation counsel cannot represent both city council as intervening plaintiffs and the defendants in this action. Code of Professional Responsibility, Canon 5; DR 5-105. Once it became apparent to corporation counsel that city council intended to file its motion to intervene and join the lawsuit on plaintiffs' side, it was incumbent on corporation counsel to accede to

a proper request to appoint special corporation counsel under § 6-408 of the city charter. Where authority exists for the appointment of special counsel and where corporation counsel refuses to exercise its discretion under that authority, it is within the power of the circuit court to review the decision and make the appropriate appointment if necessary.

Affirmed.